1

2

3

4

5

6

7

8                                    **UNITED STATES DISTRICT COURT**

9                                         **DISTRICT OF NEVADA**

10

11   CARY WALLACE WILLIAMS,                    )
                                              )
12            Petitioner,                      )        2:98-CV-0056-PMP-VCF
                                              )
13   vs.                                       )
                                              )        **ORDER**
14   RENEE BAKER,[1] *et al.*,                 )
                                              )
15            Respondents.                     )
                                              )
16   _____/

17          Before the court for a decision on the merits is an application for a writ of habeas corpus filed

18   by Cary Wallace Williams, a Nevada prisoner sentenced to death.  ECF No. 135.[2]

19          I.  FACTUAL AND PROCEDURAL HISTORY

20          On August 18, 1982, a grand jury for the Second Judicial District Court for Washoe County,

21   Nevada, handed down an indictment charging Williams with murder, manslaughter, and burglary.

22   Two months earlier, Williams had broke into the Reno home of Allen and Katherine Carlson, got a

23   _____

24   [1]       Renee Baker is substituted for her predecessor, E.K. McDaniel, as Warden of Ely State Prison.
     Fed. R. Civ. P. 25(d).

25   [2]       Docket entries from number 117 forward have been imaged for the purposes of CM/ECF, the
     court's electronic filing system.  All citations to the record for documents that have been imaged (i.e.,
26   ECF No. 117 and above) refer to the CM/ECF attachment and page numbers.  Citations to the record
     for document numbers 1 through 116 refer to the hard-copy file maintained by the court.

knife from the kitchen, and proceeded to the master bedroom, where he stabbed Katherine to death. Katherine's unborn daughter, eight months in utero, died from lack of oxygen.[3]

On the first day of jury selection for his trial (December 6, 1982), Williams entered a plea of guilty to the burglary charge. On December 13, 1982, after four days of jury selection and one day of testimony, Williams entered pleas of guilty to the other two charges – i.e., murder in the first degree and manslaughter. On January 4, 1983, a penalty hearing began before a three-judge panel. On January 6, 1983, the panel found four aggravating circumstances: that the murder was committed while the defendant was engaged in the commission of a burglary, the murder was committed while the defendant was engaged in the commission of a robbery with the use of a deadly weapon, the murder was committed by the defendant for the purpose of avoiding and preventing his lawful arrest, and the murder committed by the defendant involved depravity of mind and torture. The panel found "no mitigating circumstances to outweigh" the aggravating circumstances, and sentenced Williams to death.

Judgment was entered on January 13, 1983. Williams appealed to the Nevada Supreme Court. On February 3, 1983, while the appeal was pending, Williams filed a *pro se* petition for post-conviction relief in the Second Judicial District Court.

On July 19, 1983, the Nevada Supreme Court granted the state's motion to hold the direct appeal in abeyance until the post-conviction proceedings were concluded. On October 1, 1984, Williams, now represented by counsel, filed a supplemental petition for post-conviction relief in the Second Judicial District Court. On November 2, 1984, the district court held an evidentiary hearing on the claims raised in the initial *pro se* petition and the supplemental petition. On November 7, 1984, the district court denied relief. Williams appealed to the Nevada Supreme Court. On May 29, 1987, the Nevada Supreme Court consolidated the proceedings on direct appeal and collateral

[3]     Two other defendants, Charles Wilkinson and Harvey Young, were charged in separate proceeding with participating in the burglary and murder.

2

review, and affirmed the conviction and sentence and the denial of post-conviction relief.  *Williams v. State*, 737 P.2d 508 (Nev. 1987).

On September 23, 1987, Williams filed an initial *pro se* federal habeas petition this court that was assigned case number CV-N-87-471-ECR.  The Federal Public Defender was appointed to represent Williams.  On May 20, 1988, United States District Judge Edward C. Reed, Jr., dismissed the petition without prejudice.  On July 6, 1988, Williams filed another petition for post-conviction relief in the Second Judicial District Court.

On July 8, 1988, the Second Judicial District Court, without holding an evidentiary hearing, denied the second petition for post-conviction relief.  Williams filed a notice of appeal to the Nevada Supreme Court the same day.  Also on that day, Williams filed a petition for writ of habeas corpus in the First Judicial District Court for Nevada.

On July 11, 1988, without conducting an evidentiary hearing, the First Judicial District Court denied the habeas petition on the ground that the claims contained therein had already been rejected by the Nevada Supreme Court.  Williams filed a notice of appeal.  On July 12, 1988, the Nevada Supreme Court consolidated the appeals from the First and Second Judicial District Courts and dismissed them.  That same day, Williams filed a federal habeas petition in this court that was assigned case number CV-S-88-928-LDG(LRL).

On June 5, 1989, this court granted Williams's motion for leave to return to state court based on the allegation that he entered his guilty plea to the murder based on sworn statements of a witness who made subsequent sworn statements that the earlier statements were false and were motivated by the witness's desire to earn a lesser prison sentence.  After unsuccessfully seeking relief in the Nevada courts, Williams filed, on November 30, 1990, a second amended federal petition in this court.

On December 31, 1992,  Williams filed a petition for writ of habeas corpus in the Seventh Judicial District Court for Nevada.  On April 20, 1993, this court dismissed the federal petition

1  without prejudice.  On July 16, 1993, Williams filed an amended petition for post-conviction relief

2  in the state proceeding.

3       On December 1, 1995, the state district court held an evidentiary hearing on Williams's first

4  amended petition.  On August 15, 1996, the court granted the State's motion to dismiss on the

5  ground that the issues were without merit because they had already been presented or should have

6  been presented in previous petitions.  Williams filed an appeal that was dismissed by the Nevada

7  Supreme Court on August 29, 1997.

8       On April 14, 1998, this court granted Williams leave to file the federal petition initiating the

9  instant action.  On September 17, 1999, with the Federal Public Defender having been appointed as

10  counsel, Williams filed an amended petition for writ of habeas corpus, which was followed by a

11  second amended petition filed on May 30, 2002.  On May 6, 2003, pursuant to a stipulation by the

12  parties, the court held this proceeding in abeyance to allow another attempt at exhaustion.

13       On March 3, 2003, Williams filed a state habeas petition in the Second Judicial District

14  Court.  On December 30, 2004, the state court denied relief without setting an evidentiary hearing,

15  stating that the petition was untimely and "failed to plead facts which would support a finding of

16  good cause and prejudice."  After Williams appealed, the Nevada Supreme Court issued, on

17  December 8, 2006, an Order of Affirmance concluding that the burglary and robbery aggravators

18  should be stricken pursuant to *McConnell v. State*, 102 P.3d 606 (Nev. 2004).   Even so, the state

19  supreme court reweighed the remaining aggravators (i.e., torture and depravity of mind and

20  avoidance of lawful arrest) and concluded beyond a reasonable doubt that the three-judge sentencing

21  panel still would have found Williams death eligible and imposed a death sentence.

22       Both parties filed a petition for rehearing.  On January 16, 2007, the Nevada Supreme Court

23  denied both petitions.  Williams then filed a petition for rehearing *en banc*.  In an order entered July

24  5, 2007, the state supreme court denied *en banc* reconsideration.  In doing so, the court explained at

25  length why it determined that one of Williams's ineffective assistance claims was procedurally

26

4

1  barred notwithstanding Williams's argument that he could demonstrate a fundamental miscarriage of

2  justice.

3          On September 21, 2007, this court granted Williams's motion to reopen these proceedings;

4  and, on October 24, 2007, Williams filed his third amended petition for writ of habeas corpus.  ECF

5  Nos. 134/135.  On August 8, 2008, respondents filed a motion to dismiss contending that several

6  claims in the petition are either barred by the doctrine of procedural default or time-barred by 28

7  U.S.C. § 2244(d).  ECF No. 145.  Pursuant to that motion, this court dismissed several claims from

8  the amended petition.  ECF No. 165.  Claims One(A, B, F, G), Two, Four, Eight and Sixteen remain

9  before the court for a decision on the merits.[4]

10         II. STANDARDS OF REVIEW

11         This action was initiated on January 12, 1998.  Because this action was initiated after

12  April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and

13  Effective Death Penalty Act (AEDPA) apply.  *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997);

14  *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), overruled on other grounds by *Lockyer v.*

15  *Andrade*, 538 U.S. 63 (2003); *see also* Reply at ECF No. 182, pp. 5, 51, 56 (conceding that AEDPA

16  habeas standards apply).

17         28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

18              An application for a writ of habeas corpus on behalf of a person in custody
           pursuant to the judgment of a State court shall not be granted with respect to any
19         claim that was adjudicated on the merits in State court proceedings unless the
           adjudication of the claim –
20
              (1)  resulted in a decision that was contrary to, or involved an unreasonable
21         application of, clearly established Federal law, as determined by the Supreme Court
           of the United States; or
22
              (2)  resulted in a decision that was based on an unreasonable determination of
23         the facts in light of the evidence presented in the State court proceeding.

24

_____

25  [4]      On March 28, 2011, this court denied Williams's motion for an evidentiary hearing in relation
    to his petition.  ECF No. 187.

26

5

1    28 U.S.C. § 2254(d).

2          A decision of a state court is "contrary to" clearly established federal law if the state court

3    arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the

4    state court decides a case differently than the Supreme Court has on a set of materially

5    indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable

6    application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

7    Court] to the facts of a prisoner's case." *Id.* at 409.  "[A] federal habeas court may not "issue the

8    writ simply because that court concludes in its independent judgment that the relevant state-court

9    decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

10         The Supreme Court has explained that "[a] federal court's collateral review of a state-court

11   decision must be consistent with the respect due state courts in our federal system." *Miller–El v.*

12   *Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for

13   evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

14   doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333,

15   n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's

16   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

17   could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct.

18   770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court

19   has emphasized "that even a strong case for relief does not mean the state court's contrary

20   conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also*

21   *Cullen v. Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to

22   meet and highly deferential standard for evaluating state-court rulings, which demands that

23   state-court decisions be given the benefit of the doubt") (internal quotation marks and citations

24   omitted).

25         "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

26

1   adjudicated the claim on the merits." *Cullen*, 131 S.Ct. at 1398.  In *Cullen*, the Court reasoned that

2   the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court

3   decision at the time it was made," and, therefore, the record under review must be "limited to the

4   record in existence at that same time i.e., the record before the state court."  *Id*.

5          For any habeas claim that has not been adjudicated on the merits by the state court, the

6   federal court reviews the claim *de novo* without the deference usually accorded state courts under 28

7   U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

8   F.3d 1160, 1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting

9   that federal court review is *de novo* where a state court does not reach the merits, but instead denies

10  relief based on a procedural bar later held inadequate to foreclose federal habeas review).  In such

11  instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Cullen*,131 S.Ct at 1401

12  ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas

13  relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct

14  under § 2254(e)(1) even if legal review is *de novo*).

15         Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

16  habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

17  application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so,

18  however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas

19  court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) –

20  whether a state court decision is contrary to, or involved an unreasonable application of, clearly

21  established Federal law."  *Id.*

22         III.  ANALYSIS OF CLAIMS

23                **Claim One(A)**

24         In Claim One(A), Williams claims that he received ineffective assistance of counsel because

25  his counsel failed to have him examined by a competent neuropsychologist prior to trial.  According

26

7

1   to Williams, such an examination would have revealed that, as a result of neurological impairments,

2   he "is likely to suffer from increased impulsivity, problems with judgment, poor overall problem

3   solving abilities, and difficulty incorporating important facts into his decision-making process."

4   ECF No. 135, p. 27.  Williams contends that effective counsel would have presented this information

5   to the sentencing panel.  He further alleges that his impairments made him more likely to follow

6   counsel's advice to plead guilty and also affected his ability to understand the consequences of

7   entering a guilty plea.

8        In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

9   prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming

10  ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation

11  "fell below an objective standard of reasonableness," and (2) that the attorney's deficient

12  performance prejudiced the defendant such that "there is a reasonable probability that, but for

13  counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*,

14  466 U.S. at 688, 694.  To overcome the strong presumption that counsel has acted competently (*id*. at

15  690), a defendant must show that counsel failed to act "reasonabl[y] considering all the

16  circumstances."  *Id*. at 688.  If the petitioner makes an insufficient showing as to either one of the

17  two *Strickland* components, the reviewing court need not address the other component.  *Id*. at 697.

18        Williams presented this claim to the Nevada courts in his final state post-conviction

19  proceeding.  As noted above, the Nevada Supreme Court concluded that the claims presented in that

20  proceeding were untimely.  In denying *en banc* reconsideration, however, the court addressed the

21  merits of Williams's claim that counsel was ineffective in failing to present brain damage evidence.

22  ECF No. 136-4, p. 513-18.  The court was "not persuaded that even assuming trial counsel had

23  discovered and presented the brain damage evidence Williams now [relies upon] that it had a

24  reasonable probability of altering the outcome of the penalty hearing."  *Id*., p. 516.  Even though the

25  court was considering the claim as part of its procedural default analysis, the ruling constitutes an

26

8

1   adjudication on the merits for the purposes of § 2254(d).  *See Early v. Packer*, 537 U.S. 3, 8 (2002)

2   (holding that AEDPA deference is afforded where the state court applies a standard that is the

3   functional equivalent of the federal standard).

4        This court is not convinced that the state court rejection of the claim was contrary to, or an

5   unreasonable application of, clearly established federal law, as determined by the Supreme Court, or

6   that the state court's ruling was based on an unreasonable determination of the facts in light of the

7   evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  Williams argues that the

8   state court erred by discounting the weight of Williams proffered evidence[5] without conducting an

9   evidentiary hearing.  Even accepted at face value, however, the findings and opinions of Drs.

10  Schmidt and DePry would have added, at most, only marginal benefit to Williams's mitigation case.

11       Counsel presented substantial mitigation evidence on Williams's behalf at the penalty

12  hearing.  ECF No. 173-7, p. 42-51; ECF No. 173-8, p. 1-51; ECF No. 173-9, p. 1-51; ECF No. 173-

13  10, p. 1-46.  Not counting Williams himself, she called ten witnesses to the stand and elicited

14  extensive testimony about the adverse conditions Williams faced growing up in violent and crime-

15  ridden communities in southern California.  The sentencing panel was informed that his mother died

16  of cancer when he was nine years old and that his biological father was not involved in his

17  upbringing.  He spent the rest of his childhood living with relatives, mostly with his mother's cousin

18  in the years following his mother's death and later with his maternal grandmother.  He was described

19  by various witnesses as a very thoughtful, dutiful, and dependable boy, who was committed to

20  protecting and taking care of his younger sisters.  According to testimony, Williams was hit very

21  hard not only by the loss of his mother, but also his maternal grandmother and an uncle, both of

22  whom died when he was seventeen years old.

23       Counsel called several witnesses who testified about Williams's redeeming qualities and the

24

25  [5]   The evidence consists of a neuropsychological assessment by David L. Schmidt, Ph.D., and
    psychiatric evaluation by Dennis L. DePry, D.O., both conducted in 1999. ECF No. 136-3, p. 104-129.
26

contributions he could make to his family and other prisoners if his life were to be spared.  His

fiancee expressed her intent to marry him even though he had plead guilty to murder.  His great

uncle stated that he had employed Williams for four years and described him as reliable, respectful,

and the best worker he had ever seen.  A friend with whom Williams attended college testified about

Williams's efforts to improve himself and desire to work his way out of the rough neighborhood in

which they lived.  A former neighbor detailed  how Williams, without being asked, came over to

work around her house and helped her take care of her children.

When Williams testified, he recounted his version of the murder, which, according to him,

was the result of panic brought about by unexpectedly confronting someone when he assumed no

one was home.  Counsel also elicited testimony about Williams's background.  After describing his

family and educational background, Williams indicated that his brief stint at community college

ended when he was shot in a drive-by shooting that resulted in three surgeries.  He then left Los

Angeles for San Diego, where he worked for a short time, first mixing cement, then cleaning up

parks.  Returning to Los Angeles but not wanting to stay, Williams used connections he had

established while boxing in the Job Corps program a few years earlier to relocate to Reno, where he

lived with a boxing manager and worked as a maintenance person in the subdivision where he

committed the Carlson murder.

The reports of Schmidt and DePry contain some information that may have added some

mitigatory weight to Williams's case, but not a significant amount.  Based on Williams's

performance on neuropsycological tests, Dr. Schmidt opined that Williams had suffered sufficient

brain damage to cause a change of functioning that included the attributes mentioned above – i.e.,

increased impulsivity, problems with judgment, poor overall problem solving abilities, and difficulty

incorporating important facts into his decision-making process.  Dr. DePry noted that, had he been

asked to testify at Williams's penalty hearing, he would have testified "about the effects of the

patient's turbulent, chaotic and abusive upbringing as it relates to his behavior and personality."

10

1    The proffered reports are not only not particularly compelling, Dr. Schmidt's report contains

2    information that may have actually hurt Williams's chances for a more lenient sentence.

3    Specifically, Dr. Schmidt noted that Williams's personality profile was indicative of individuals who

4    are "angry, argumentative, and resentful of any demands being placed upon them" and who may

5    "become hostile and angry [when] their expectations are not met."  ECF No. 136-3, p. 110.  In any

6    case, there is a "reasonable argument" that the outcome of Williams's penalty proceeding would not

7    likely have been different had counsel investigated and presented the evidence of brain damage upon

8    which Williams now relies.  *See Richter*, 131 S.Ct. at 788.  Thus, Williams is not entitled to relief

9    because he cannot "show that the state court's ruling on the claim being presented in federal court

10   was so lacking in justification that there was an error well understood and comprehended in existing

11   law beyond any possibility for fairminded disagreement."  *Id.* at 786–787.

12   With regard to Williams's claim that his mental impairments impacted the voluntariness of

13   his guilty plea, the proffered evidence falls well short of showing that Williams is entitled to habeas

14   relief based on such a theory.  More specifically, there has been no showing that Williams's alleged

15   mental impairments prevented him from knowingly, voluntarily, and intelligently entering a guilty

16   plea with complete knowledge of the relevant circumstances and likely consequences.  *Brady v.*

17   *United States*, 397 U.S. 742, 747-48 and n. 4 (1970).

18   **Claim One(B)**

19   In Claim One(B), Williams claims that he received ineffective assistance of counsel because

20   his counsel failed to conduct adequate guilt phase research and investigation.  Williams identifies

21   several ways in which he claims counsel was deficient in this respect: (1) she failed to utilize the

22   services of a competent investigator; (2) she failed to obtain adequate discovery from the prosecutor,

23   including information suggesting that Charles Wilkinson played a greater role in the homicide; (3)

24   she failed to research and accurately advise Williams as to constitutional issues regarding the

25   admissibility of the statements of his non-testifying co-defendants; and (4) she failed to use available

26

11

information, including Williams's own inconsistent statements, to refute Williams's testimony that he had acted alone.  This claim was rejected on procedural grounds in state court.  Thus, it is subject to *de novo* review by this court.

Much of the evidence Williams relies upon to substantiate this claim was not presented  to the state court until he litigated his final state petition, which was rejected by the Nevada Supreme Court on adequate and independent procedural grounds.  As explained in this court's order denying Williams's motion for an evidentiary hearing (ECF No.187), 28 U.S.C. § 2254(e)(2) bars this court from considering such evidence in deciding the merit of Williams's claims.  Moreover, Williams has proffered no evidence at all to support some of his allegations, such as his claim that part of the reason he plead guilty to the murder is that counsel inaccurately advised him that his co-defendants' statements could be used against him at trial.

At the state court evidentiary hearing held on November 2, 1984, Williams's trial counsel, Shelly O'Neill, testified that, in the months leading up to trial, she had prepared a defense that conceded Williams's participation in the burglary, but argued that a co-defendant was the actual killer.  ECF No. 173-13, p. 31.  According to her testimony, the decision to plead guilty to the murder came about when, after having difficulty with practice cross-examination, Williams confessed to her that he had killed Carlson and told her that he did not feel that he could hold up under the prosecutor's cross examination.  *Id.*, p. 32.

Despite having opportunities at two separate state court evidentiary hearings, Williams did not present any substantial evidence with respect to O'Neill's efforts, or lack thereof, in preparing a guilt phase defense.  In Claim One(B), he relies on a declaration from Robert Howell, an investigator with the public defender's office assigned to Williams's case, in attempting to show that O'Neill's performance was deficient.  ECF No. 136-3, p. 500-01.  However, that declaration, not prepared until 1999, is subject to the aforementioned bar imposed by § 2254(e)(2).

In addition, the decision to plead guilty to the murder and focus on the penalty phase was

12

1   reasonable given the overwhelming evidence of Williams's guilt (including his own confession),

2   together with a lack of evidence showing that one of co-defendants committed the killing. *See*

3   *Florida v. Nixon*, 543 U.S. 175, 191-92 (2004) (holding that counsel's strategic decision to concede

4   guilt and focus on the penalty phase was not ineffective assistance of counsel under the *Strickland*

5   standard notwithstanding the absence of defendant's explicit consent).  Claim One(B) is denied.

6                    **Claim One(F)**

7        In Claim One(F), Williams claims that he received ineffective assistance of counsel because

8   counsel failed to present available mitigation evidence during the penalty phase of his trial.

9   Williams alleges that his upbringing was far more bleak than what counsel presented at his penalty

10  hearing and, in support of this claim, Williams sets out a very detailed social history, based

11  primarily on declarations of relatives and acquaintances, along with records from the juvenile court

12  in Los Angeles County.  That history includes the following information.

13       Prior to his mother's death when he was nine years old, Williams witnessed her being beaten

14  by his step-father.  Williams was also physically abused by both his step-father and mother.

15  Beginning at age eight, Williams witnessed his mother's slow and agonizing death from cancer.

16  When she died, Williams, then nine years old, was forced into the role of caretaker for his younger

17  sisters.  In the ensuing years, Williams and his sisters were passed from relative to relative,

18  witnessing or experiencing neglect, alcohol abuse, physical and emotional abuse, and molestation.

19  In early adolescence, Williams began consuming alcohol, sniffing glue, and smoking marijuana on a

20  regular basis.  By age thirteen, he was an alcoholic, and, at fifteen, he began using PCP.  Drugs and

21  gangs pervaded the neighborhoods of Compton and Watts, where Williams resided throughout his

22  youth.  Homicides were a regular occurrence and, in addition to being the victim of a drive-by

23  shooting, Williams was once shot in the leg at a high school dance.

24       Williams presented this claim to the state court in the amended petition for post-conviction

25  relief that he filed on July 16, 1993.  ECF No. 173-20, p. 8-41.  As noted above, the state district

26

                              13

1   court held an evidentiary hearing in that case.  ECF No. 173-21, p. 1-49; 173-22, p. 1-61.  O'Neill

2   and Williams testified at the hearing, but the testimony elicited by Williams's counsel focused

3   almost entirely on his conflict of interest claim (see discussion of Claim Four, below) to the

4   exclusion of all other claims.  *Id*.  Even so, the State appeared to stipulate to allowing the state court

5   to consider exhibits submitted with state petition (including several of the declarations cited in

6   support of Claim One(F)).  ECF 173-21, p. 9-10.

7       The state district court dismissed the claim on grounds that Williams's ineffective assistance

8   of counsel claims had already been decided by the Nevada Supreme Court and that, as a result, the

9   court was bound by the law of the case doctrine.  ECF No. 173-23, p. 1-9.  The court also found,

10  however, that the claim was "directly contradicted by the evidence received by [the court]."  *Id*., p. 9.

11  On appeal, the Nevada Supreme Court upheld the lower court's law of the case determination, and

12  also held that, to the extent he was raising "new and different grounds for relief," Williams had not

13  shown that failure to raise such grounds in an earlier petition should be excused due to cause and

14  prejudice or his "actual innocence."  *Id*., p. 10-14.  Thus, because the claim was rejected on

15  procedural grounds in state court, it is subject to *de novo* review by this court.

16      As recounted above in relation to Claim One(A), much of the social history set forth in

17  support of this claim was, indeed, presented to the three-judge panel.  Of the fifteen declarations

18  from relatives and acquaintances that Williams cites, six are from witnesses O'Neill called to testify

19  at the penalty hearing.  And, strangely, some of the declarants are the very people other declarants

20  accuse of mistreating or abusing Williams and his sisters.

21      By selectively compiling allegations from the various declarants, Williams has presented a

22  social history on paper that contains some dramatic circumstances not elicited by O'Neill at

23  Williams's penalty hearing.  However, attempting to present that history before the sentencing panel,

24  with witnesses giving conflicting testimony and being subject to cross-examination, would have

25  painted a murky and confusing picture of Williams's childhood.  In addition, presenting additional

26

14

evidence regarding Williams's substance abuse would not have necessarily added weight to his case

for mitigation.  *See Cullen*, 131 S.Ct. at 1410 (noting that evidence of serious substance abuse is "by

no means clearly mitigating").

O'Neill's mitigation case adhered to a coherent theme – that being to portray Williams as a

thoughtful and caring young man who was forced to overcome a series of adverse family and social

circumstances from a very early age and worked hard to try to improve his situation.  It is also

apparent from the record that O'Neill arrived at this strategy after conducting a reasonable

investigation into Williams's family and social background.  In sum, Williams has not overcome the

presumption of competence mandated by *Strickland*.  *See Cullen*, 131 S.Ct. at 1406-07 (noting that

*Strickland* "rejected the notion that the same investigation will be required in every case" and

requires the habeas court to strongly presume that counsel exercised reasonable judgment in making

all significant decisions).  And for the reasons discussed above, there is not reasonable probability

that the additional evidence Williams presented to the state court in post-conviction proceedings

would have resulted in a better outcome at sentencing.  Claim One(F) is denied.

**Claim One(G)**

In Claim One(G), Williams claims that he received ineffective assistance of counsel because

counsel failed to obtain a defense expert to rebut the alleged aggravating circumstance of torture.  In

support of this claim, Williams alleges that counsel never met with Dr. Roger Ritzlin, the expert

used by the State at the penalty hearing to establish that Williams tortured Carlson.  According to

Williams, a "competent expert" could have demonstrated that Carlson's wounds "were not

consistent with torture wounds."  ECF No. 135, p. 54.

Williams presented this claim to the state court in the amended petition for post-conviction

relief that he filed on July 16, 1993.  ECF No. 173-20, p. 8-41.  For the exact same reasons discussed

above in relation to Claim One(F), this claims is subject to *de novo* review by this court.

In support of this claim, Williams submits a report from Donald Reay, M.D., a forensic

15

1   pathologist.  ECF No. 136-3, p. 88-103.  In the report, Dr. Reay disagrees with Dr. Ritzlin's

2   conclusion that the numerous superficial knife wounds found on Carlson's body were evidence of

3   torture.  *Id*.  Here again, however, the report was not prepared until 1999 and is, therefore, beyond

4   the scope of this court's review under § 2254(e)(2).  Having not shown that a defense expert would

5   have been able to effectively rebut the State's evidence in support of the torture aggravator, Williams

6   has not met the prejudice prong of the *Strickland* standard.  *See Bible v. Ryan*, 571 F.3d 860, 871 (9th

7   Cir. 2009) (holding that speculation as to evidence that *could* have been presented is insufficient to

8   show *Strickland* prejudice).

9          As for the allegation that counsel had not met with Ritzlin prior to trial, O'Neill's cross

10   examination of the expert was conducted in an effective manner.  ECF No. 173-7 p. 25-42.  She

11   undermined Ritzlin's testimony that the wounds inflicted on Carlson were similar to those he had

12   observed in examining victims of gang-related torture killings in southern California.  She was able

13   to establish that, unlike Carlson, the victims in all of those cases had been bound.  *Id*., p. 35.  In

14   addition, Ritzlin admitted, under cross-examination, that he did not know whether the gang killings

15   he testified about were committed by a single individual or a group.  *Id*.  He also conceded that some

16   of Carlson's wounds were consistent with defensive wounds and that the wounds he identified as

17   evidence of torture could also be evidence of "severe struggle."  *Id*, p. 36-37.  Even if O'Neill

18   neglected to interview Dr. Ritzlin prior to trial, Williams has not shown that her cross examination

19   of him would have been more effective had she done so.  Thus, the alleged omission did not give rise

20   to the type of prejudice contemplated by *Strickland*.  Claim One(G) is denied.

21                    **Claim Two**

22          In Claim Two, Williams claims that his conviction and death sentence violate his

23   constitutional rights because the Washoe County Public Defender's Office failed to provide him

24   with resources necessary for his defense.  He alleges that the office was not adequately staffed to

25   handle its caseload, both in terms of the number and the experience of attorneys working in the

26

1    office.  He further alleges that O'Neill was overworked and that she did not utilize the services of the

2    investigator assigned to the case or, for that matter, any other investigator.

3         In *United States v. Cronic*, 466 U.S. 648 (1984), the Court recognized that prejudice is, in

4    most cases, an essential part of a claim of ineffective assistance of counsel:

5         [T]he right to the effective assistance of counsel is recognized not for its own sake,
         but because of the effect it has on the ability of the accused to receive a fair trial.
6         Absent some effect of challenged conduct on the reliability of the trial process, the
         Sixth Amendment guarantee is generally not implicated.

7

8    *Cronic*, 466 U.S. at 658.  The *Cronic* Court went on to hold, however, that there are "circumstances

9    that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is

10   unjustified." *Id*.  Examples of such circumstances are complete denial of counsel at a critical stage

11   of trial or failure on the part of counsel to subject the prosecution's case to meaningful adversarial

12   testing. *Id*. at 659.  "Circumstances of that magnitude may be present on some occasions when

13   although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a

14   fully competent one, could provide effective assistance is so small that a presumption of prejudice is

15   appropriate without inquiry into the actual conduct of the trial." *Id*. at 659–60.

16        In this case, Williams's allegations regarding lack of resources provided for his defense by the

17   Washoe County Public Defender's office do not show that his defense was so undermined that there

18   should be a presumption of prejudice, under *Cronic*, without inquiry into the actual conduct of the

19   trial.  As such, the court determines that Claim Two does not set forth a viable claim that the alleged

20   lack of resources was a violation of Williams's right to effective assistance of counsel.  Because it

21   does not independently state a viable claim for habeas corpus relief, the court will deny Claim Two.

22                    **Claim Four**

23        In Claim Four, Williams claims that his constitutional rights were violated because his trial

24   counsel labored under an actual conflict of interest that adversely affected her performance.  The

25   claim is premised on allegations that Williams's trial counsel, O'Neill, established an attorney-client

26

17

1  relationship with Wilkinson, Williams's separately charged co-defendant, prior to undertaking

2  representation of Williams.

3        As factual support for this claim, Williams relies, primarily, on testimony given by Williams

4  and O'Neill at the state post-conviction evidentiary hearing held on December 1, 1995.  ECF No.

5  136-4, p. 104-212.  At that hearing, Williams testified that, during their initial meeting at the Washoe

6  County jail, O'Neill told him that she had already spoken with Wilkinson and that she had yet to

7  decide whom she was going to represent.  *Id*., p. 174.  According to her testimony, O'Neill had no

8  memory of meeting with Wilkinson, but also noted that her recollection was "hazy," having "not

9  seen the file in probably 12 or 13 years."  *Id*., p.120.

10        "To establish a violation of the right to conflict-free counsel, the petitioner must show either

11  that (1) in spite of an objection, the trial court failed to allow him the 'opportunity to show that

12  potential conflicts impermissibly imperil[ed] his right to a fair trial;' or (2) that an actual conflict of

13  interest existed."  *Alberni v. McDaniel*, 458 F.3d 860, 869-70 (9th Cir. 2006) (citing *Cuyler v.*

14  *Sullivan*, 446 U.S. 335, 348 (1980)).  Because he never raised an objection based on the alleged

15  conflict in the trial court, Williams must show that an actual conflict of interest existed.

16        That is, he must demonstrate that O'Neill's performance was adversely affected by the

17  alleged conflict.  *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)  ("[A]n actual conflict of interest

18  [means] precisely a conflict that *affected counsel's performance*--as opposed to a mere theoretical

19  division of loyalties.").  To meet this standard, he must show "that the attorney's behavior seems to

20  have been influenced by the conflict," which, though not a showing of actual prejudice, "remains a

21  substantial hurdle."  *Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (quoted citations

22  omitted).

23        Here, not only are Williams's allegations and evidence lacking in substance, he has also

24  failed to link the purported conflict to a particular defect in counsel's performance.  *See, e.g.*, *Lewis*

25  *v. Mayle*, 391 F.3d 989, 998-99 (9th Cir. 2004) (considering link between the conflict and counsel's

26

omissions in cross-examination).  There is little more than Williams's self-serving testimony to

support a finding that the jailhouse meeting between O'Neill and Wilkinson ever took place.  Even if

it did, there is virtually no support in the record for Williams's allegation that the O'Neill's

"concurrent representation" caused her to not use information at her disposal "showing that

Wilkinson was the actual perpetrator of the homicide."  ECF No. 182, p. 44.

Having not made the showing required by *Cuyler* and *Mickens*, Williams is not entitled to

relief under Claim Four.

**Claim Eight**

In Claim Eight, Williams claims that his conviction and death sentence are unconstitutional

due to the State's failure to disclose exculpatory and impeachment evidence.  According to Williams,

such evidence consisted of the following:

> . . . "a statement of Mr. Williams' to a reporter in which Mr. Williams denied
> committing the murder, (Ex. 151); a July 27, 1982 statement of Harvey Young, which
> refutes Mr. Wilkinson's alibi and magnifies Wilkinson's level of involvement in the
> homicide, (Ex. 116 attached hereto); a criminalistics report dated July 7, 1982 which
> reveals that bags on the victim's hands showed presence of animal hair and
> light-colored human hair (Ex. 117 attached hereto); a July 30, 1982, report of
> co-defendant Charles Wilkinson's polygraph results, reflecting a determination that
> Wilkinson was "deceptive" as to his alleged lack of knowledge about the details of
> the homicide (attached hereto as Ex. 118); and a report of a March 2, 1983 interview
> with DeLeon Fair, which refers to a post-homicide discussion between Young and his
> girlfriend, Juliana Rogers, as to whether they could obtain secret witness money
> (attached hereto as Ex.119)."

ECF No. 135, p. 86 (referenced exhibits located at ECF No. 136).  Williams further alleges that the

State "also failed to disclose material, exculpatory information evidence pertaining to Mr. Williams'

juvenile adjudications, and to his assertion of his right to counsel."  *Id.*

The prosecution's suppression of evidence favorable to an accused violates due process

where the evidence is material to either guilt or punishment, irrespective of the good faith of the

prosecutor.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  There are three components of a *Brady*

violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory

or because it is impeaching; (2) the evidence must have been suppressed by the State either willfully

19

1    or inadvertently; and (3) prejudice must have ensued.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004);

2    *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

3         "Such evidence is material 'if there is a reasonable probability that, had the evidence been

4    disclosed to the defense, the result of the proceeding would have been different.'"  *Strickler v.*

5    *Greene,* 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "[T]here is

6    never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable

7    probability that the suppressed evidence would have produced a different verdict."  *Strickler v.*

8    *Greene,* 527 U.S. at 281.  A "reasonable probability" is a probability sufficient to undermine

9    confidence in the outcome.  *United States v. Bagley*, 473 U.S. at 681-82; *see also Kyles v. Whitley*,

10   514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not

11   have received a different verdict with the evidence, but whether in its absence he received a fair trial,

12   understood as a trial resulting in a verdict worthy of confidence.").

13        The Nevada Supreme Court considered the federal law merits of this claim in determining

14   whether Nev. Rev. Stat. § 34.726 barred his state petition.  See ECF No. 145-2, p. 11.  The state

15   supreme court stated that it had reviewed Williams's argument and proffered evidence and

16   concluded that he "failed to demonstrate any *Brady* violation."  *Id*.  As with Claim One(A), this court

17   must apply § 2254(d) deference even though the state court was considering the claim as part of its

18   procedural default analysis.

19        To show that the evidence identified above was withheld, Williams offers a 1999 declaration

20   from his then-habeas counsel, Rebecca Blaskey, stating that she had compared "what purport to be

21   the original trial files of the attorneys for Mr. Williams and his two-separately charged co-

22   defendants" and found that certain police reports and witness statements in the co-defendants' files

23   did not appear in Williams's file.  ECF No. 136-4, p. 213-15.  Even accepting Blaskey's declaration

24   as true and accurate, her comparison of files conducted more than fifteen years after Williams's trial

25   is not particularly strong showing with respect to the suppression element.  *Cf. Banks*, 540 U.S. at

26

1    693 (finding suppression of evidence for *Brady* purposes where the State persisted in hiding

2    witness's informant status at trial and in state habeas proceedings); *Strickler*, 527 U.S. at 275

3    (confining *Brady* analysis to exhibits that prosecutor admittedly failed to disclose).

4        Williams also falls short of showing that the evidence was material to either guilt or

5    punishment.  Williams argues that, without the withheld evidence, the sentencing panel was deprived

6    of "an accurate picture of his culpability."[6]  ECF No. 135, p. 87; ECF No. 182, p. 46.  As

7    respondents point out, however, Williams was always aware of his level of culpability relative to that

8    of his co-defendants.  According to his *own testimony* before the sentencing panel, he performed the

9    actual killing by himself.  *Cf. Brady*, 373 U.S. at 84 ("Brady took the stand and admitted his

10   participation in the crime, but he claimed that [his accomplice] did the actual killing.").  Thus, the

11   evidence that Williams points to as elevating the culpability of his co-defendants (which is

12   questionable, at best) would have done little to improve his chances before the sentencing panel.

13   In addition, the evidence relating to his juvenile adjudications (ECF No. 136-4, p. 419-49) would not

14   have added substantial weight to his case for mitigation; and, the evidence that supposedly shows

15   that he asserted his right to counsel (ECF No.136-4, p. 1-2) would have added no weight whatsoever.

16       In sum, there is not a reasonable probability that, but for the State's failure to disclose the

17   evidence at issue, the results of the Williams's sentencing proceeding would have been different.

18   Moreover, the state court's rejection of Williams's Brady claim was not "so lacking in justification

19   that there was an error well understood and comprehended in existing law beyond any possibility for

20   _____

21   [6]    In countering the State's argument that his *Brady* claim was waived under *Tollett v. Henderson*, 411 U.S. 258 (1973), Williams emphasizes that the focus of his claim is the sentencing proceeding, not

22   the guilty plea.  He further argues that, even if that were not the case, *Sanchez v. U.S.*, 50 F.3d 1448 (9th Cir. 1995), allows a defendant to challenge his guilty plea based on an alleged *Brady* violation.

23       Under *Sanchez*, Williams would need to establish "a reasonable probability that but for the failure to disclose the *Brady* material, [he] would have refused to plead and would have gone to trial."

24   50 F.3d at 1454.  Williams does not claim that he can make such a showing.

25

26
                                              21

1   fairminded disagreement." *Richter*, 131 S.Ct. at 786-87.  Accordingly, Claim Eight is denied.

2             **Claim Sixteen**

3         In Claim Sixteen, Williams claims that his death sentence violates his constitutional rights

4   because it is based on an invalid aggravating circumstance, that being that the homicide was

5   committed to avoid lawful arrest.  He argues that there was insufficient evidence to support the

6   finding.  He further argues that the statutory definition of the factor is impermissibly vague and

7   overbroad and that the factor is unconstitutional "as applied."

8         According to Williams, the aggravating factor, as defined at Nev. Rev. Stat. § 200.033(5),

9   lacks rational standards to be applied by prosecutors and sentencing bodies and fails to give adequate

10  notice to defendants.  He also contends that, as applied by the Nevada courts, the factor is

11  unconstitutional because its scope has been expanded to include homicides occurring in the absence

12  of an identifiable "lawful arrest" and does not rationally narrow the class of homicides subject to the

13  death penalty.

14        In *Godfrey v. Georgia*, the Supreme Court considered an aggravating circumstance

15  instruction that allowed for the death penalty if the jury found that the murder was "'outrageously or

16  wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated

17  battery to the victim.'"  446 U.S. 420, 422 (1980) (quoting Georgia statute).  The Court held that the

18  instruction was unconstitutional as applied in that case because it resulted in "standardless and

19  unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed

20  jury."  *Id*. at 429.  The Court further held that the Georgia Supreme Court failed to cure the defect

21  because it did not apply a constitutional construction of the statutory language in affirming the death

22  sentences on appeal.  *Id*. at 432-33.

23        As explained in *Tuilaepa v. California*, the Supreme Court has found very few aggravating

24  factors to be impermissibly vague and all of those have been similar to each other.  512 U.S. 967,

25  973-74 (1994) (citing to *Godfrey* and *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988) as

26

22

1   examples, the latter of which addressed an aggravating circumstance that asked whether the murder

2   was "especially heinous, atrocious, or cruel").[7]  An aggravating factor withstands a constitutional

3   challenge if it has some "common sense core of meaning . . . that criminal juries should be capable

4   of understanding."  *Id*. at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)).  However, to be

5   constitutional, an aggravating circumstance must "not apply to every defendant convicted of a

6   murder; it must apply only to a subclass of defendants convicted of murder."  *Tuilaepa*, 512 U.S. at

7   972; *see also Arave v. Creech*, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that

8   an aggravating circumstance applies to every defendant eligible for the death penalty, the

9   circumstance is constitutionally infirm.").

10          Here, the sentencing panel was called upon to determine whether "the murder was committed

11   by the defendant for the purpose of avoiding and preventing his lawful arrest for the burglary of the

12   victim's home."  Document No. 14, Exhibit I-C.  The "core meaning" of the factor at issue is readily

13   understandable from this language.  In addition, the statutory language defining the circumstance is

14   specific enough to guide the sentencing body and avoid arbitrary and capricious imposition of the

15   death and sufficiently narrows the class to defendants to which it applies.  *See Wainwright v.*

16   *Lockhart*  80 F.3d 1226, 1231 (8th Cir. 1996) (upholding the validity of an Arkansas statute that the

17   killing was committed for the purpose of avoiding or preventing an arrest or effecting an escape from

18   custody); *Davis v. Executive Director of Dept. of Corrections*, 100 F.3d 750, 769 (10th Cir. 1996)

19   (holding that Colorado's "avoiding or preventing lawful arrest or prosecution" sufficiently narrows

20   the class of persons eligible for the death penalty "by putting the focus on the purpose of the

21   murder.").

22

---

23   [7]  Though *Tuilaeapa* was decided 18 years ago, this state of affairs still applies today.  In the rare
     instances since *Tuilaeapa* where the Court has found an aggravator invalid on vagueness grounds, the

24   aggravator has consisted of pejorative adjectives that generally apply to all murders.  *See*, *e.g.*, *Barber*
     *v. Tennessee*, 513 U.S. 1184 (1995) (mem.) (denying certiorari on other grounds, but noting "wicked or

25   morally corrupt" as an aggravator is "plainly impermissible" because such a state of mind is
     characteristic of every murder).

26

1    Williams is also incorrect in arguing that the Nevada courts have not applied the aggravating

2    circumstance in a constitutional manner.  In both the cases Williams cites – *Cavanaugh v. State*, 729

3    P.2d 481, 486 (Nev. 1986) and *Evans v. State*, 926 P.2d 265, 280-81 (Nev. 1996), an antecedent

4    crime occurred, and the murderer killed the victim to prevent the victim's identification of the

5    murderer for that crime.  Applying the factor in this manner does not run afoul of the Constitution.

6    *Davis* 100 F.3d at 770; *accord Wainwright*, 80 F.3d at 1231 (holding that the aggravator was

7    properly applied to a murder which was committed in the course of a robbery, in order to prevent the

8    murderer's identification by the victim).  As discussed below, that is precisely how the circumstance

9    was applied in this case.

10    The standard used by the federal habeas court to determine whether a state court finding of an

11    aggravating circumstance is supported by sufficient evidence is the same "rational factfinder"

12    standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979), to test whether sufficient evidence

13    supports a state conviction.  *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).  Under that standard, the

14    court inquires as to "whether, after viewing the evidence in the light most favorable to the

15    prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

16    reasonable doubt." *Jackson*, 443 U.S. at 319 (citation omitted).

17    Here, Williams testified at this penalty hearing that he thought no one was home when he

18    entered the Carlson's residence and that he would not have committed the burglary if he thought

19    there was.  ECF No. 173-8, p. 39-40.  According to his testimony, he obtained the knife used to

20    murder Carlson after noticing a purse on the kitchen counter.  Id., p. 44-45.  He further testified that,

21    upon encountering the victim in the bedroom, she said, "Oh my God, you're the kid from down the

22    street." *Id*., p. 46;  ECF No. 173-9, p. 25-26.  He said that he then saw her reach for a drawer next to

23    the bed, at which point, he "cut her off" and stabbed her.  ECF No. 173-9, p. 45; ECF No. 173-10, p.

24    25-27.

25    Viewing this evidence in a light most favorable to the prosecution, a rational factfinder could

26

24

1   have found beyond a reasonable doubt that Williams committed the murder to avoid or prevent a

2   lawful arrest.  Thus, Williams is not entitled to relief under the *Jackson* standard.  Claim Sixteen is

3   denied.

4          IV.  IMPACT OF *MARTINEZ*

5          On May 5, 2012, this court entered an order permitting each party to file a supplemental brief

6   addressing the impact of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), on this case.  ECF No. 190.  In

7   *Martinez*, the Court held that, in collateral proceedings that provide the first occasion to raise a claim

8   of ineffective assistance at trial, ineffective assistance of post-conviction counsel in that proceeding

9   may establish cause for a prisoner's procedural default of such a claim.  *Martinez*, 132 S. Ct. at 1315.

10         The Court in *Martinez* stressed that its holding was a "narrow exception" to the rule in

11  *Coleman v. Thompson*, 501 U.S. 722 (1991), that "an attorney's ignorance or inadvertence in a

12  postconviction proceeding does not qualify as cause to excuse a procedural default."  *Martinez*, 132

13  S.Ct. at 1315.  It is clear from the opinion that the exception does not extend beyond ineffective

14  assistance of trial claims.  *See id.* at 1320.  Thus, in this case, *Martinez* would potentially apply to

15  only the sub-claims set forth under Claim One.

16         In asserting procedural defenses to Williams's claims, however, the respondents also raised

17  lack of timeliness under 28 U.S.C. § 2244(d) with respect to several of those sub-claims, most

18  notably each of the sub-claims that have not been addressed on the merits above – i.e., Claims

19  One(C-E and H-I).  ECF No. 145, p. 44-49.  In adjudicating respondents' motion to dismiss, this

20  court agreed that Claim One(C) is time-barred, but, having found Claims One(D, E, H, I, or J)

21  procedurally defaulted, did not determine whether they are also time-barred.  ECF No. 165, p. 15-19.

22  For the reasons that follow, the court now concludes that *all* of the sub-claims in Claim One not

23  addressed on the merits above are, in fact, time-barred under *Mayle v. Felix*, 545 U.S. 644 (2005).[8]

24   

25  [8]    The court's order adjudication the respondents' motion to dismiss includes a discussion of how

26  *Mayle* applies to this case.  See ECF No. 165, p. 15-16.

In Claim One(D), Williams claims that  he received ineffective assistance of counsel because of his trial counsel's performance during the jury selection phase of the trial.  ECF No. 135, p. 31-34.  As grounds for the claim, he relies upon several statements counsel made to prospective jurors during the voir dire process.  *Id*.  In opposing respondents' motion to dismiss, Williams argued that this claim related back to Claim Eight in his initial petition.  ECF No. 156, p. 46-47.  In comparing the two claims, however, the court finds they do not share a common core of operative facts.  Thus, the Claim One(D) does not relate back and is untimely.

In Claim One(E), Williams claims he received ineffective assistance of counsel because his counsel induced him into pleading guilty by representing that she was personal friends with the trial judge, who would not sentence him to death.  ECF No. 135, p. 34-35.  Williams's initial petition makes brief reference to counsel's "prediction of leniency" due to her personal friendship with the judge.  Document No. 5, p. 3.  That reference, however, is contained in introduction of the petition and is not alleged as an operative fact supporting a substantive claim.  As such, Claim One(E) does not relate back and is untimely.

In Claim One(H), Williams claims he received ineffective assistance of counsel because his counsel failed to obtain his juvenile records for the purpose of rebutting the prosecutor's presentation of Williams's prior record and failed to rebut other evidence of un-adjudicated conduct presented by the State.  ECF No. 135, p. 55-56.  The juvenile records referred to the in claim are the aforementioned records from the juvenile court in Los Angeles County; and, the un-adjudicated conduct consists of a robbery Williams purportedly committed in Reno in 1982.  *Id*.  The claim does not share a common core of operative facts with any claim or claims contained in Williams's initial petition.  Thus, the claim does not relate back and is untimely.

In Claim One(I), Williams claims he received ineffective assistance of counsel because his counsel failed to preserve his theory of defense.  ECF No. 135, p. 56-57.  Specifically, Williams alleges that counsel's investigator revealed to an attorney who shared office space with co-defendant

26

1   Wilkinson's counsel that Williams's defense was based on the theory that Wilkinson, not Williams,

2   killed the victim.  *Id.*   The claim does not share a common core of operative facts with any claim or

3   claims contained in Williams's initial petition.  Thus, the claim does not relate back and is untimely.

4        In Claim One(J), Williams claims he received ineffective assistance of counsel because his

5   counsel failed to litigate several motions and objections in order to protect his constitutional rights.

6   ECF No. 135, p. 57-58.  Williams argues that this claim relates back to Ground One of his initial

7   petition, wherein Williams faulted counsel for failing to raise several enumerated evidentiary

8   challenges.  Document No. 5, p. 15-18.  Those challenges bear virtually no factual relationship,

9   however, to the motions and objections set forth in Claim One(J).  Consequently, Claim One(J) does

10  not relate back and is untimely.

11       Because all of the claims to which the *Martinez* holding could potentially apply are time-

12  barred, the court will not delve into whether the procedural default of the claims may be excused due

13  to ineffective assistance of post-conviction counsel.  With his supplemental brief, Williams asks the

14  court to consider whether he is entitled to equitable tolling in light of *Holland v. Florida*, 130 S.Ct.

15  2549 (2010), which held that a habeas petitioner may be entitled to equitable tolling if he can show

16  that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his

17  way and prevented timely filing.  130 S.Ct. at 2560.  The holding in *Holland*, however, was already

18  the law in this circuit when this court addressed equitable tolling in the context of deciding

19  respondents' motion to dismiss.  *See Waldron-Ramsey v. Pacholke*,  556 F.3d 1008, 1011 (9th Cir.

20  2009).  As such, the court declines to revisit the issue.

21       V.  CONCLUSION

22       For the reasons set forth above, Williams is not entitled to habeas relief.

23                         *Certificate of Appealability*

24       Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section

25  2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the

26

1   court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a

2   COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

3          Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

4   substantial showing of the denial of a constitutional right."  With respect to claims rejected on the

5   merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

6   assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

7   (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

8   will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

9   denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

10          The COA standard is not high.  Williams must only "'sho[w] that reasonable jurists could

11   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to

12   proceed further.'"  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations

13   omitted).  Having reviewed its determinations and rulings in adjudicating Williams's petition, the

14   court finds that the *Slack* standard is met with respect the court's resolutions of Claims One(G) and

15   Sixteen.  The court therefore grants a certificate of appealability as to those issues.  The court

16   declines to issue a certificate of appealability for its resolution of any procedural issues or any of

17   Williams's other habeas claims.

18          **IT IS THEREFORE ORDERED** that petitioner's third amended petition for writ of habeas

19   corpus (ECF No. 135) is DENIED.  The Clerk shall enter judgment accordingly.

20          **IT IS FURTHER ORDERED** that a Certificate of Appealability is issued as to the court's

21   resolution of Claims One(G) and Sixteen.

22   \ \ \

23   \ \ \

24   \ \ \

25    \ \ \

26

1    **IT IS FURTHER ORDERED** that the Clerk of the Court shall substitute Renee Baker for

2  E.K. McDaniel, on the docket, as the respondent warden in this action, and shall update the caption

3  of the action to reflect this change.

4        DATED:  July 1, 2012

5

6  _____

UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26