UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

Cary Wallace Williams,

                                        Petitioner,

        v.

William Gittere,[1] et al.,

                                        Respondents.

Case No. 2:98-cv-00056-APG-VCF

**Order**

        This is a habeas corpus proceeding under 28 U.S.C. § 2254 on remand from the United States Court of Appeals for the Ninth Circuit. *See Williams v. Warden*, 908 F.3d 546 (9th Cir. 2018).  I have conducted an evidentiary hearing and entertained briefing on the remanded claims in petitioner Cary Williams' habeas petition.  For reasons that follow, I deny habeas relief.

**I.  SCOPE OF REMAND**

        The Ninth Circuit affirmed in part and reversed in part this court's final order denying habeas relief (ECF No. 196).  The Ninth Circuit held that this court erred in dismissing Claims 1(C), 1(D), 1(E), 1(H), 1(I), 1(J), 9, and 14 in Williams' third amended petition (ECF No. 135) because he is entitled to equitable tolling for those claims.  *Williams*, 908 F.3d at 561.  The Ninth Circuit also held that, because Claims 1(D), 1(E), 1(H), 1(I), and 1(J) are ineffective assistance of counsel (IAC) claims that were procedurally defaulted under state law, this court needs to determine whether the default is excused under the rule established in *Martinez v. Ryan*, 566 U.S. 1 (2012).  *Id*. at 580.  In addition, the Ninth Circuit held "that the district court abused its discretion in denying an evidentiary hearing on Claim 1(F) and remand[ed] for such a hearing."  *Id*. at 571.

---

[1] The current warden of Ely State Prison, William Gittere, is substituted for his predecessor, William Reubart, as the primary respondent. *See* Fed. R. Civ. P. 25(d).

## II. PROCEEDINGS ON REMAND[2]

In accordance with my scheduling order on remand (ECF No. 241), the respondents filed an answer responding to Claims 1(C), 1(D), 1(E), 1(H), 1(I), 1(J), 9, and 14 and presenting argument as to why the procedural default of Claims 1(D), 1(E), 1(H), 1(I), and 1(J) should not be excused under *Martinez*. ECF No. 253. Williams filed a reply to the answer and a motion for evidentiary hearing asking to expand the evidentiary hearing beyond Claim 1(F) to include the remaining claims. ECF Nos. 262/264. The respondents opposed the motion for all claims except Claim 1(H), which is encompassed by Claim 1(F). ECF No. 277. I granted the motion with respect to Claim 1(H) only and denied it for the remaining claims. ECF No. 286.

In May 2022, I held a three-day evidentiary hearing on Claims 1(F) and 1(H). Both parties filed post-hearing briefs. ECF Nos. 334, 336.

## III. DISCUSSION[3]

### A. *Tollett v. Henderson*

The respondents argue that Claims 1(D), 1(I), 1(J), 9, and 14 are barred as a result of Williams' guilty pleas. In *Tollett v. Henderson*, the Supreme Court of the United States held that "when a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." 411 U.S. 258, 267 (1973). An exception to this general rule is "that a habeas petitioner may 'attack the voluntary and intelligent character of the guilty plea' based on pre-plea ineffective assistance of counsel 'by showing that the advice he received from counsel was not within the' 'range of competence demanded of attorneys in criminal cases.'" *Mahrt v. Beard*, 849 F.3d 1164, 1170 (9th Cir. 2017) (citing *Tollett*, 411 U.S. at 267–69). The court in *Mahrt* clarified that this

---

[2] The factual and procedural history of this case prior to remand are detailed in this court's final order denying relief (ECF 195 at 1-5) and in the Ninth Circuit's opinion (*Williams*, 908 F.3d at 553-57).

[3] For ease of reading, I use footnotes to cite to the record in this section. All citations to "exhibits" refer to evidentiary hearing exhibits.

exception to the *Tollett* bar is not limited to incompetent advice from counsel and extends to instances in which "the action, or inaction, of counsel prevent[ed] petitioner from making an informed choice whether to plead." *Id*.

In Claim 1(D), Williams alleges that his trial counsel failed to provide effective assistance during the jury selection process.  He contends that counsel made statements to the jury panel that denigrated her own status as a public defender and exacerbated juror prejudice by highlighting the issue of race.  He further alleges that counsel failed to challenge the racial composition of the jury and failed to elicit information necessary to challenge jurors for cause. According to Williams, counsel's deficient performance resulted in the selection of biased jurors.

The respondents contend that the claim is barred under *Tollett* "because it does not involve advice from counsel."[4]  As noted, however, the exception to the *Tollett* bar is not limited to incompetent advice from counsel. *Mahrt*, 849 F.3d at 1170.  Trial counsel, Shelly O'Neill, testified in post-conviction proceedings that unfavorable jury selection was one of the factors in Williams' decision to enter a guilty plea to manslaughter and first-degree murder.[5]  Because it is arguable that "the action, or inaction, of counsel prevent[ed] petitioner from making an informed choice whether to plead" (*id*.), Claim 1(D) is not barred under *Tollett*.  I address the claim on the merits in section III.C. below.

In Claim 1(I), Williams alleges that his trial counsel provided ineffective assistance because her investigator revealed the theory of Williams' defense to an attorney who shared office space with the attorney representing one of Williams' separately-charged co-defendants. The defense theory was that, although he participated in the burglary, Williams did not personally kill the victim, Katherine Carlson, and her unborn child.  Williams also alleged in Claim 1(I) that O'Neill's performance was deficient because she did not make an opening statement in the guilt phase of his trial.  Unlike with Claim 1(D), there is no indication that the

---

[4] ECF No. 280 at 2.

[5] ECF No. 173-14 at 33-35.

deficiencies alleged in Claim 1(I) may have affected Williams' decision to enter guilty pleas. Thus, Claim 1(I) is barred under *Tollett*.

In Claim 1(J), Williams alleges that his trial counsel provided ineffective assistance throughout the criminal proceedings against him by failing to raise and litigate objections and motions necessary to protect his constitutional rights. As explained below in section III.C., the only portion of the claim that is properly pleaded is an allegation that counsel was ineffective by failing to establish that Williams' statements to the police were inadmissible under *Edwards v. Arizona*, 451 U.S. 477 (1981). Claims of ineffective assistance based on counsel's failure to suppress a confession are not barred under *Tollett*. *See Mahrt*, 849 F.3d at 1170–71. So, I address the claim on the merits below.

In Claim 9, Williams alleges a violation of his constitutional rights due to the trial court's admission of his statements made in custody after his request to consult with an attorney. He claims that, when asked to take a polygraph test upon returning to Reno after waiving extradition from California, he requested appointment of counsel. According to Williams, the State's failure to honor that request rendered inadmissible his custodial statements made in subsequent interviews. He contends that the trial court's denial of his motion to suppress the statements contributed to his involuntary decision to plead guilty and infected his sentencing proceeding.

With respect to the guilt phase of Williams' trial, Claim 9 falls squarely within the *Tollett* bar. *See*, *e.g.*, *Marrow v. United States*, 772 F.2d 525, 527 (9th Cir. 1985) (finding that claim that the petitioner confessed because he was threatened was barred by *Tollett*). However, Williams argues that *Tollett* has no bearing on his challenge to the admission of the statements during the penalty phase of his trial. While he does not cite any authority for this position, the respondents fail to address it in their response.[6] I need not resolve the issue because, as discussed below, I conclude that the state court's decision to not exclude the statements is entitled to deference under 28 U.S.C. § 2254(d) and, alternatively, that any error was harmless.

---

[6] ECF No. 280 at 2, 17-19.

4

In Claim 14, Williams alleges a violation of his constitutional rights because his trial was held in an unfairly prejudicial atmosphere and the trial court refused to change the venue of the trial.  He claims that extensive media coverage prior to his trial unfairly affected the jury's consideration of his case.  According to Williams, the responses of some of the jurors who were ultimately selected for his jury demonstrate the negative impact pre-trial publicity had on the fairness of the proceedings.

Claim 14 alleges a deprivation of constitutional rights that occurred prior to the entry of the Williams' guilty plea.  Williams contends that it is not barred by *Tollett* because the trial court's denial of his motion for a change of venue rendered his guilty plea involuntary.  *Tollett* clearly holds, however, Williams "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann* [*v. Richardson*, 397 U.S. 759 (1970)]." *Tollett*, 411 U.S. at 267.  Because Claim 14 does not allege pre-plea ineffective assistance of counsel, it is barred under *Tollett*.

### B. *Martinez v. Ryan*

As noted above, the court of appeals directed me to determine whether the procedural defaults of Claims 1(D), 1(E), 1(H), and 1(J)[7] should be excused under the rule established in *Martinez v. Ryan*, 566 U.S. 1 (2012).  Instead of conducting a strict *Martinez* analysis, I address below the merits of each of these ineffective assistance of claims under *Strickland v. Washington*, 466 U.S. 668 (1984).  Having determined that Williams cannot satisfy the *Strickland* standard, I conclude that Williams is not entitled to relief on any of the claims irrespective of whether he can meet the *Martinez* standard.

### C. Merits of Remaining Claims

1. *Ineffective assistance of trial counsel*

Claims 1(C), 1(D), 1(E), 1(H), and 1(J) all allege that O'Neill failed to provide Williams effective assistance of counsel.  *Strickland* governs the analysis of IAC claims.  Under

---

[7] Having found that it is barred under *Tollett*, Claim 1(I) is omitted from this list.

*Strickland*, Williams must demonstrate that his counsel's performance was constitutionally deficient and that the deficient performance prejudiced him. 466 U.S. at 687.  To establish deficient performance, Williams must show that his counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688.  For prejudice, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Because he challenges counsel's performance in relation to guilty pleas, Williams can show prejudice by demonstrating a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Claim 1(C) -- In Claim 1(C), Williams alleges that he was deprived of his constitutional right to effective assistance of counsel when O'Neill advised him to enter a guilty plea to burglary.  He claims that O'Neill advised him to enter the plea without letting him know the plea would establish his guilt of first-degree murder under the felony murder rule.  He points to a statement O'Neill made during of his plea colloquy that shows she was not aware that the State had charged him under the felony murder theory.  He further claims that there is nothing in the record indicating that she notified him that the plea would establish an aggravating circumstance making him eligible for the death penalty.

Williams entered his guilty plea to the burglary charge on the first day of jury selection for his trial.  Prior to accepting his plea, the trial court confirmed that Williams understood the rights he was waiving by entering the plea.[8]  The court also confirmed that he understood the nature of the charge, that he had been advised by his attorney of the possible penalty, and that his decision was not based on any threats or promises.[9]  The prosecutor then interjected that, in addition to a possible one to ten-year sentence, the plea also included collateral consequences

---

[8] ECF No. 173-4 at 35.

[9] *Id*. at 36-36.

under the felony murder rule and the doctrine of conspiracy, which had the potential of "locking [Williams] into a first degree murder."[10]

The following exchange then occurred:

>MISS O'NEILL:  First, I would object to [the prosecutor's] statements regarding the felony murder.  And I would like the record to reflect that no felony murder charge has been maintained by the District Attorney's Office.

>[PROSECUTOR]:  That's incorrect.

>MISS O'NEILL:  Additionally, Mr. Williams has been so advised.

>[PROSECUTOR]:  Your Honor, just to clarify the matter.  The Indictment itself says that the offense was committed in the general language of first degree murder; that is, with malice aforethought, deliberation, and premeditation.  But it also stated . . . that the murder was committed in the course, furtherance and perpetration of the burglary of the victim's home.  Necessarily bringing into play the doctrine of felony murder.

>So he should be aware of that, and counsel has indicated that he is aware of it.  But I'd like him to state that as well.

>THE COURT:  All right.  Mr. Williams, you've heard what [the prosecutor] has said, and counsel's indicated to the Court it has been explained to you.  I'm going to ask you again, is your plea this morning to Count III, burglary, contained within the Indictment . . . a voluntary one at this time?

>THE DEFENDANT:  Yes.

>THE COURT:  All right.  The Court at this time finds the defendant's plea is voluntary, that he fully understands the nature of the offense and the consequences of his plea, and therefore accepts his plea of guilty at this time.[11]

At the evidentiary hearing on Williams' initial post-conviction petition, O'Neill testified that in the months leading up to trial she had prepared a defense conceding Williams' participation in the burglary, but claiming that he was not the one who killed Katherine.[12]  She noted that "all the evidence pointed to the fact that Cary was inside the house."[13]  That evidence

---

[10] Id. at 37-39.

[11] Id. at 39.

[12] ECF No. 173-14 at 11, 33.  Two other defendants, Charles Wilkinson and Harvey Young, were charged in separate proceedings with participating in the burglary and murder.

[13] Id. at 11.

included Williams' palm print in the house, his own statements to the police, and Katherine's jewelry being discovered at a pawn shop in Los Angeles, where Williams had fled after the murder.[14]  O'Neill reasoned that "it would add credibility to Cary's statement, when he was on the stand, to testify that he was actually in the house, but he did not commit the murder."[15]

Williams argues that the above excerpt from the plea canvass shows that O'Neill advised him to plead guilty based on her misunderstanding that the State had not charged him with felony murder.  He challenges O'Neill's statement that she had advised him about the felony murder rule, arguing that she would have had no reason to do so if she was not aware that the State was charging him under that theory.  According to Williams, O'Neill's statement to the court that she had informed him of felony murder rule was a self-serving afterthought.

While that is a plausible interpretation of the excerpt, I cannot find, based on the cold transcript alone, that O'Neill failed to advise Williams about the consequences of his plea.  An equally plausible interpretation of the excerpt is that O'Neill was in the process of making two points when the prosecutor interrupted her because the first point was not accurate.  Just because she was raising an objection (albeit an unfounded one) to the prosecutor's comments about felony murder does not mean that she did not inform Williams about the theory.  And, in any case, Williams confirmed that his guilty plea was voluntary after the felony murder rule had been explained to him.[16]

Faced with overwhelming evidence that Williams was at the scene of the crime, O'Neill's options for a viable defense were clearly limited.  She reasonably concluded that the best way, perhaps the only way, to reduce Williams' culpability and avoid the death penalty

---

[14] *Id*. at 11, 17, 27-28, and 47.

[15] *Id*. at 11.

[16] Williams insists an evidentiary hearing is necessary to resolve whether O'Neill advised him of the felony murder rule prior to entering his plea.  But as I concluded in ruling on his motion to expand the evidentiary hearing in this case (ECF No. 264), Williams had the opportunity to develop facts in support of Claim 1(C) in state court and failed to do so. ECF No. 286 at 1-3.

would be to concede that he was present at the time, but claim that another intruder committed the actual murder. In addition, the concession was the only way for Williams to maintain credibility, to the extent his testimony was necessary to support the theory.

As for the guilty plea providing the State with an aggravating circumstance, Williams has not demonstrated that O'Neill did not explain that consequence to him. The likelihood of Williams receiving the death penalty would have been significantly lessened if the defense succeeded and Williams was not found to be the actual killer. So, providing the State with an aggravating circumstance was a reasonable risk under the circumstances.

In sum, counsel made a reasonable strategic decision by advising Williams to enter a guilty plea to burglary. Such decisions cannot support a claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690; *Mickey v. Ayers*, 606 F.3d 1223, 1238–39 (9th Cir. 2010). Williams has not shown that his guilty plea was involuntary due to ineffective assistance of counsel. Claim 1(C) is denied.

Claim 1(D) -- As described above, Claim 1(D) is a claim that trial counsel performed ineffectively during the jury selection process. Williams faults O'Neill for making statements to the jury panel that denigrated her own status as a public defender and exacerbated juror prejudice by highlighting the issue of race. With respect to the latter, he claims that questioning the entire panel about race injected the issue into the proceeding in a way that did not yield information about jurors' views because she was essentially asking the jurors to self-identify as racists.

I agree that O'Neill's statements and questions to the entire panel were unlikely to elicit responses that would assist her in removing biased jurors. However, Williams has not shown that it had an appreciable effect on the composition of the jury that was ultimately selected. In addition, O'Neill filed a successful motion for individual voir dire, which allowed her to ask sensitive questions and have potential jurors answer them outside the presence of other panel members.[17]

---

[17] ECF No. 173-14 at 20-21.

Williams also contends that O'Neill failed to develop and raise meritorious challenges for cause. He cites the following examples.

For Juror Felker, Williams notes that, when asked his position on the death penalty, "he indicated he believed in '[an] eye for an eye.'"[18] When questioned further, however, he indicated that he understood that a finding of guilt does not automatically warrant the death penalty.[19] He also confirmed that he would be willing to consider the alternative penalties for murder.[20] I am not convinced that the record shows that there was a sound basis for challenging Felker for cause or that there is a reasonable probability that the trial court would have granted the challenge.

For Juror Eriksen, Williams notes that she "indicated, 'Well, I'm not especially fond of black guys.'"[21] That response occurred when O'Neill was posing general questions about race to the entire panel. O'Neill neglected to follow up on this issue when Eriksen was brought up for individual questioning. O'Neill did, however, use one of her peremptory challenges to remove Eriksen from the jury.[22] So, Williams cannot claim that her presence on the jury affected to his decision to enter a guilty plea.[23]

For Juror Pease, Williams alleges that he "knew a great deal about the case, including information he received from law enforcement," and that his connection to the case due to his work with Job Corps and his "stated concern about 'public relations of the University' rendered

---

[18] ECF No. 262 at 41 (citing ECF No. 263-1 at 54).

[19] ECF No. 263-1 at 56, 58-59.

[20] *Id*. at 58.

[21] ECF No. 262 at 41 (citing ECF No. 263-1 at 29).

[22] ECF No. ECF No. 263-4 at 69.

[23] By posing additional questions regarding racial bias, O'Neill may have been able to successfully challenge Eriksen for cause, which would have allowed her to save the peremptory challenge for another juror. That possibility alone, however, is not sufficient to satisfy the prejudice prong under *Strickland/Lockhart*.

him biased."[24]  Pease testified that he learned about the case before it was reported in the media because the Chief of the University Police Department reports to the same supervisor that he does.[25]  He further testified that he did not recall the details of the case, but he was sure that he would recall them as the trial progressed.[26]  He also indicated that he learned through the University Police and through employees at the Jobs Corps Center that "it was a Job Corps man or an ex-Job Corps man that was involved in the case," but that he was not provided a name and was not privy to any additional information about Williams.[27]

O'Neill questioned Pease extensively about his relationship with Job Corps and the University and how it might impact his deliberations.[28]  None of his answers suggested that he would harbor a bias against Williams.  In fact, O'Neill could have reasonably viewed Pease's allegiance to Job Corps as favorable to Williams.[29]  In addition, Pease responded to questions about serving on a prior jury indicating that he thought the defendant was treated unfairly ("I don't think justice was carried out by convicting him.") and the prosecuting attorney had abused his power.[30]  In sum, the record reflects that O'Neill did not perform below the *Strickland* standard by not challenging Pease for cause.

For Juror Davis, Williams alleges that she "described being raped in her home, how her mother worked as a dispatcher, and how news coverage of the case convinced her the crime was

---

[24] ECF No. 262 at 42 (citing ECF No. 263-1 at 68-70).

[25] ECF No. 263-1 at 69-70.

[26] *Id*.

[27] *Id*. at 72-73.

[28] *Id*. at 78-80.

[29] O'Neill testified in post-conviction proceeding that she had colleagues from her office sit in the audience during jury selection to assess the reactions and body language of potential jurors to help her determine "whether or not a person will be positive or negative." ECF No. 173-14 at 19.

[30] *Id*. at 77.

'heinous.'"[31]  With respect to the rape, Davis indicated that it had occurred 12 years earlier and that, though it happened in her home, it was not during a burglary.[32]  Davis also testified that her mother, in her current position, rarely handled incoming calls and, to Davis' knowledge, had no close acquaintances who were police officers.[33]  Davis testified that her personal opinion of the crime, based on the media coverage of she had seen, was that it was "a heinous crime."[34] However, she confirmed in responding to several follow-up questions that she would set aside that opinion and consider only what was presented at trial.[35]  She also testified that her opinion of the death penalty "depends on the situation" and that she would consider age, lack of a criminal record, and lack of a history of violence as mitigating factors.[36]  The record does not show a sound basis for challenging Davis for cause or that there is a reasonable probability that the trial court would have granted the challenge.  I also find that O'Neill had a valid strategic reason for not raising such a challenge.

For Juror Gabriel, Williams notes that her daughter worked for the Sparks Police Department.[37]  Gabriel testified that her daughter was a matron for the department, not a uniformed officer, and that she had worked there for about two years.[38]  Gabriel also testified she did not know any of her daughter's co-workers.  The record does not show a sound basis for

---

[31] ECF No. 262 at 42 (citing ECF No. 263-3 at 104, 110).

[32] ECF No. 263-3 at 104, 110.

[33] *Id*. at 107.

[34] *Id.* at 100.

[35] *Id*. at 111.

[36] *Id*. at 112, 114.

[37] ECF No. 262 at 42 (citing ECF No. 263-4 at 14).  Williams does not allege, nor does it appear from the record, that the Sparks Police Department was involved in the investigation of this case or in apprehending Williams.

[38] ECF No. 263-4 at 18.

challenging Gabriel for cause or that there is a reasonable probability the trial court would have granted the challenge.

For Juror Cheeks, Williams notes that he was a uniformed police officer. [39]  Cheeks testified that he formerly worked as a police officer for the Department of Defense for about three years and a peace officer for a college campus for one year.[40]  O'Neill questioned him extensively on how those positions might impact his ability to serve as an impartial juror.[41]  None of his answers suggested that he would be a biased juror.[42]  The record does not show a sound basis for challenging Cheeks for cause or that there is a reasonable probability the trial court would have granted the challenge.

For Juror Hengerer, Williams alleges that he "indicated he could not devote full attention to the trial because, he testified, 'I just don't believe I can split myself from my work.'"[43]  Hengerer testified that he was the manager of a liquor store.[44]  When he indicated that he would not be able to devote one hundred percent of his attention to the trial, O'Neill developed testimony indicating the trial would be occurring during the holiday season, the busiest time of the year for store, and that Hengerer would be distracted from his duties as a juror.[45]  She then twice challenged him for cause on that basis.[46]  The trial court denied both challenges.[47]  O'Neill performed effectively in attempting to remove Hengerer as a juror.

---

[39] ECF No. 262 at 42 (citing ECF No. 263-5 at 11).

[40] ECF No. 263-5 at 11, 15.

[41] *Id*. at 11-17.

[42] *Id*.

[43] ECF No. 262 at 42 (citing ECF No. 263-6 at 45).

[44] ECF No. 263-6 at 35.

[45] *Id*. at 45-47.

[46] *Id*. at 47,55.

[47] *Id*. at 49, 56.

For Juror Mongolo, Williams alleges that "he indicated all murders should be punished with the death penalty [and] that there were no factors he would consider to negate that."[48]  After Mongolo expressed this opinion, O'Neill explained to him the penalty phase process, including the presentation of aggravating and mitigating evidence, and the three possible penalties – life with the possibility of parole, life without the possibility of parole, or death.[49]  When asked follow-up questions, Mongolo testified that he could consider the sentencing options, that he would follow the law, that he did not believe that all murderers should die, and that he understood that the law required him to consider factors irrespective of his personal feelings.[50]  Mongolo confirmed these points when responding to questions posed by the prosecuting attorney.[51]  The record does not show a reasonable probability that the trial court would have excused Mongolo for cause if O'Neill had raised such a challenge.

For Juror Parker, Williams alleges that she "admitted knowing about the crime through the media and that it 'sounded bad.'"[52]  While she testified that she had seen media reports about the crime, Parker also testified that she "didn't know the details."[53]  Her opinion that the crime "sounded bad" was followed up with, "I mean, there were others that did sound bad also."[54]  So her opinion was not necessarily focused on Williams' case, as much as murders in general. When asked her opinion of the death penalty, she responded, "The only thing I can say about it is, I really don't like it, but in cases [sic], I guess it has to be."[55]  The record does not show a

---

[48] ECF No. 262 at 42 (citing ECF No. 263-3 at 23).

[49] *Id*. at 23-24.

[50] *Id*.

[51] *Id*. at 29-30.

[52] No. 262 at 42 (citing ECF No. 263-3 at 8).

[53] ECF No. 263-3 at 8.

[54] *Id*.

[55] *Id*. at 10.

sound basis for challenging Parker for cause or that there is a reasonable probability the trial court would have granted the challenge. I also find that O'Neill had a valid strategic reason for not raising such a challenge.

For the foregoing reasons, I am unable to conclude that O'Neill provided ineffective assistance in failing to challenge certain jurors for cause. I also note that, while only two were excused, O'Neill challenged five jurors and two alternate jurors for cause.[56] Williams claims that O'Neill failed to ask sufficient questions to support challenges for cause but does not support the claim with specific examples. He also alleges that many of the jurors were exposed to pretrial publicity, but that alone is not grounds for challenging a juror for cause. *See Gallego v. McDaniel*, 124 F3d 1065, 1071 (9th Cir. 1997) (holding that "a defendant is entitled to an impartial jury, [but] he is not entitled to a jury completely ignorant of the facts." (quoting *United States v. Sherwood*, 98 F3d 402, 410 (9th Cir. 1996)).

Finally, Williams alleges that O'Neill was ineffective by not challenging the racial composition of the jury. While a defendant has the right to be tried by a jury drawn from a representative cross-section of the community, there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). To prevail on a fair cross-section claim, the defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

---

[56] The challenges for cause are located in the record as follows: Juror Comer (ECF No. 263-3 at 88), Juror Hull (*Id*. at 180), Juror Kline (ECF No. 263-5 at 44), Juror Seymour (*Id*. at 60), Juror Hengerer (ECF No. 263-6 at 47, 55), Juror Amendola (*Id*. at 940), and Juror Olson (*Id*. at 112).

According to Williams' own statistics, African-Americans comprised less than two percent of the population of Washoe County at the time of his trial.[57]  Thus, the absence of an African-American from his jury pool was not unreasonable in relation to the number of African-Americans in the community.  And even if it was, Willams makes no showing that African-Americans were systematically excluded in the selection process for his jury pool.  Accordingly, he has not shown a reasonable probability that O'Neill could have successfully challenged the racial composition of the jury.  Claim 1(D) is denied.

Claim 1(E) – In Claim 1(E), Williams alleges counsel was ineffective by inducing him to plead guilty based upon her claim that she was personal friends with the trial judge, Robert Schouweiler, and that he would not vote to sentence him to death.  Williams claims that advising him to plead guilty on that basis was unreasonable and that, but for that advice, he would not have pleaded guilty.

Williams pleaded guilty to murder in the first degree and manslaughter after four days of jury selection and one day of testimony.  O'Neill advised the court that one of the reasons for entering the plea was so that Williams would be sentenced by a three-judge panel rather than the jury that had been empaneled.[58]  She stated that "we feel we didn't receive a fair and impartial jury, and we'd like to go forward with a 3-judge panel."[59]  Prior to entering his plea, Williams confirmed that he had "spent considerable time" over the weekend discussing with O'Neill the sentencing procedure and the entry of his plea.[60]  The trial court had Williams confirm that

---

[57] ECF No. 262 at 43.

[58]  ECF No. 173-5 at 3.  Under Nevada law at the time, a three-judge sentencing panel was appointed when a defendant pleaded guilty to first-degree murder. Nev. Rev. Stat. § 175.558 (repealed by Laws 2003, c. 366, § 8, eff. June 9, 2003).

[59] Id. at 4.

[60] Id. at 6.

O'Neill had not promised him anything in exchange for his plea[61] and that no one had coerced him to enter the plea.[62]

As noted above, O'Neill testified in post-conviction review proceedings that she had prepared a defense conceding Williams' participation in the burglary, but claiming that he was not the one who killed Katherine Carlson.[63]  According to her testimony, she and Williams "went over and over his testimony regarding the facts, and the many inconsistencies in his testimony."[64]  Eventually, Williams broke down and "confessed to [her] that he had actually done the killing, and [said] he didn't feel he could hold up under cross examination."[65]  Those revelations, combined with "the fact that we didn't believe that we had … a fair and impartial jury," caused them to consider other options.  She then conferred with several members of her office and had the most experienced attorney, Lew Carnahan, explain the three-judge panel option to Williams.[66]  When she "was assured that all his questions had been answered … regarding the three-judge panel," she left the decision to Williams, who decided "to change his plea on Monday."[67]

Williams testified at the same hearing.  According to his testimony, he did not tell O'Neill that he committed the murder.[68]  He pleaded guilty to murder because O'Neill told him that he would have a better chance with a three-judge panel than with a jury and that Judge

---

[61] *Id*. at 6-7.

[62] *Id*. at 8

[63] ECF No. 173-14 at 11, 33.

[64] *Id*. at 34.

[65] *Id*.

[66] *Id*. at 35.

[67] *Id*.

[68] *Id*. at 39.

Schouweiler was a very good friend of hers.[69]  She told him that the most he "would probably get was life without" and that Judge Schouweiler did not believe in the death penalty.[70]  On cross-examination, Williams testified that he did not want to plead guilty but that he and O'Neill "debated with it for quite a while" and "[t]hen she persuaded me, with the help of Lew Carnahan, to plead guilty, because she thought it was the best for me."[71]

Williams' aunt, Mozelle Williams, also testified at the hearing.  According to her testimony, O'Neill told her and Williams that Williams "would come out better with a three-man judge trial," that "she knew one of the judges very well, and he was against the death penalty," and that "the most Cary would get was 20 years" if he went with the three-judge panel.[72]  When recalled as a witness by the State, O'Neill testified that she never told Williams or any of his relatives that his sentence would be 20 years at the most.[73]

Finally, the prosecuting attorney, Don Nomura, also testified at the post-conviction hearing.  According to his testimony, he advised O'Neill that "he was not receptive to any type of negotiation on the case," that he was "seeking the death penalty," and that he was "not going to alter his position in that regard."[74]  In addition, the "evidence in this case [was] overwhelming" and that, while he had not sought the death penalty in previous murder cases, it was "mandated" in this case "by virtue of the facts and circumstances."[75]

I conclude that, while O'Neill may have discussed with Williams her acquaintance with Judge Schouweiler, the record does not support a finding that it was a significant factor in

---

[69] *Id.*

[70] *Id.* at 40-41.

[71] *Id.* at 48.

[72] ECF No. 173-15 at 5.

[73] *Id.* at 7-8.

[74] *Id.* at 10.

[75] *Id.* at 11.

Williams' decision to plead guilty. The evidence against Williams, which included his multiple confessions to the police that he did the stabbing,[76] was very strong. O'Neill reasonably determined, and advised Williams, that he stood a better chance of avoiding the death penalty if he entered a guilty plea so that he could be sentenced by a three-judge panel rather than a jury that she viewed as biased. O'Neill's testimony that the decision was discussed at length among her, Williams, and Carnahan is corroborated by Williams' own testimony.

In addition, Williams' testimony that he never admitted to the murder to O'Neill and that she and Carnahan persuaded him to plead guilty against his will lacks credibility. Compared to Williams, O'Neill would have little reason to fabricate a claim that he had confessed to her. When asked on cross-examination how O'Neill and Carnahan persuaded him, Williams testified that they told him that compared to a jury the three-judge panel would not be swayed by "brutal pictures" because O'Neill was "pretty sure that at least two of the Judges that were on the three-judge panel had been to Vietnam, and had seen worse[] crimes than this."[77] This testimony is highly suspect given that the two judges who would join Judge Schouweiler on the panel would not be selected until after the plea was entered. Similarly, Mozelle Williams' claim that O'Neill guaranteed that Williams would get 20 years at the most is inconsistent with Williams' testimony that she told him that life without the possibility of parole would be the maximum sentence.[78]

---

[76] ECF No. 173-5 at 14, ECF No. 173-14 at 50.

[77] ECF No. 173-14 at 49.

[78] Williams cites to a declaration from one of his post-conviction attorneys to support Claim 1(E). ECF No. 135 at 34-35 (citing No. 136-3 at 487-89). Executed in 1999 and presented with Williams' defaulted 2003 state petition, the declaration is excluded from my consideration by 28 U.S.C. § 2254(e)(2). *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) (holding that § 2254(e)(2) prohibits the federal habeas court from considering evidence not presented to the state court in the manner prescribed by state law unless the stringent requirements of the subsection are met); *see also Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) (holding that *Martinez v. Ryan* does not allow a habeas petitioner to bypass the restrictions imposed by 28 U.S.C. § 2254(e)(2)). Even if I were to consider it, I would assign the declaration little weight. The attorney states in the declaration that O'Neill had told him that she was convinced that Judge Schouweiler would not vote for the death penalty. ECF No. 136-3 at 489. However, the same attorney did not raise the issue presented in Claim 1(E) in either of the post-conviction petitions he filed in 1988. ECF No. 173-17 at 9-23.

In sum, I am unable to conclude there is a reasonable probability that, but for unreasonable advice from O'Neill, Williams would not have pleaded guilty and would have insisted on going to trial. Claim 1(E) is denied.

Claims 1(F) and 1(H)

In Claim 1(F), Williams alleges counsel was ineffective by unreasonably failing to investigate and present substantial mitigating evidence regarding his abusive and traumatic childhood. The respondents concede that "a fair reading of the Ninth Circuit's decision implicitly finds that trial counsel was deficient in preparing Williams' mitigation case."[79] Thus, they do not contest the *Strickland* performance prong in this court, but reserve the right to address the issue on appeal.[80]

With respect to the *Strickland* prejudice analysis, the Ninth Circuit instructed as follows:

> Once the evidence underlying [Claim 1(F)] has been further developed, the district court will be in a position to determine whether Williams is entitled to relief. In assessing whether there is a reasonable probability that Williams would have received a different sentence, the district court should consider "the totality of the available mitigation evidence," including the evidence of brain damage, and "reweigh[ ] it against the evidence in aggravation," bearing in mind that two of the four aggravating factors considered at Williams' sentencing have since been stricken.

*Williams*, 908 F.3d at 571 (citation omitted). The court added a footnote indicating that any prejudice flowing from Claim 1(H) should also be included in the prejudice analysis if the district court determines that counsel's failure to obtain Williams' juvenile records amounts to deficient performance under *Strickland*. *Id*. n. 3. The respondents concede that the juvenile records are to be included in the prejudice analysis.[81] The "evidence of brain damage"

---

[79] ECF No. 299 at 3.

[80] ECF No. 334 at 9, n. 4.

[81] ECF No. 299 at 3.

mentioned in the excerpt above is the evidence Williams used to support Claim 1(A).[82]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Typically, when examining the penalty phase of a capital case, the standard requires "a reasonable probability that at least one juror" would have recommended a sentence of life instead of death. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). As noted above, however, Williams' guilty plea to first-degree murder resulted in his penalty-phase being held before a three-judge sentencing panel. Thus, the analysis is whether there is a reasonable probability that the three-judge panel would have concluded that Williams should not be sentenced death. *See Strickland*, 466 U.S. at 695 (framing the prejudice inquiry when a defendant challenges a death sentence as whether there is a reasonable probability that "the sentencer" would have reached a different outcome).

The three-judge panel found four aggravating circumstances: (1) the murder was committed while the defendant was engaged in the commission of a burglary, (2) the murder was committed while the defendant was engaged in the commission of a robbery with the use of a deadly weapon, (3) the murder was committed by the defendant for the purpose of avoiding and preventing his lawful arrest, and (4) the murder committed by the defendant involved depravity of mind and torture. The panel found only one statutory mitigating circumstance: Williams was 19 years old at the time of the offense. The Supreme Court of Nevada later ruled that the burglary and robbery aggravators should be stricken under a then-recent case (*McConnell v. State*, 102 P.3d 606 (Nev. 2004)).[83] Even so, the court reweighed the two remaining aggravators and concluded beyond a reasonable doubt that the three-judge sentencing panel still would have found Williams death-eligible and imposed a death sentence.[84]

---

[82] The Ninth Circuit determined that the evidence of brain damage used to support Claim 1(A) "was not sufficient on its own" to establish *Strickland* prejudice, but that this court's prejudice analysis on remand must include the evidence. *Williams*, 908 F.3d at 561.

[83] ECF No. 145-2 at 7-15.

[84] *Id*.

1        1.  Aggravating evidence presented at trial

2        Under Nevada law, evidence that does not prove an aggravating circumstance is still

3   admissible if it relates to the offense, the defendant, or the victim and its probative value is not

4   substantially outweighed by the danger of unfair prejudice. *McKenna v. State*, 968 P.2d 739, 744

5   (Nev. 1998).  At the penalty hearing, the State first presented the testimony of three residents of

6   Horizon Hills, the housing development where the murder occurred.  Each testified that their

7   respective homes had been burglarized in June of 1982.[85]  When Williams testified later in the

8   hearing, he admitted to committing the burglaries.[86]

9        The State then presented the testimony of Detective Loyal Means, who testified about

10  Williams' flight from Washoe County the day after the murder and his arrest in Los Angeles the

11  following month.[87]  He also provided an account of his interview of Williams wherein Williams

12  admitted to being in a gang in Los Angeles, to burglarizing homes in Horizon Hills, and to

13  planning to burglarize the Carlson home.[88]  According to Means' testimony, Williams also

14  initially identified a person named Victor Conway as the killer, but subsequently confessed that

15  he was the one who killed Katherine.[89]  After Detective Means, Sergeant Richard Putnam

16  testified briefly about Williams providing statements with three different versions of the burglary

17  and murder.[90]

18       The State also presented the testimony of Katherine's husband, Alan Carlson, who

19  provided background information about Katherine (she was a 26 year-old nurse who worked in

20  the neonatal intensive care unit at Washoe County Medical Center) and himself (he was a

21  _____

22  [85] ECF No. 173-6 at 11-12, 16, 20-21.

23  [86] ECF No. 173-9 at 37-38.

24  [87] ECF No. 173-6 at 35-36.

25  [88] *Id*. at 36-41.

26  [89] *Id*.

27  [90] ECF No. 173-7 at 2-4.

28

firefighter for the Airport Authority of Washoe County).[91]  He testified about Katherine's

healthy pregnancy after having had three miscarriages.[92]  He also recounted his discovery of

Katherine's body upon returning home from work the morning after the murder.[93]

Finally, the State presented the testimony of Dr. Roger Ritzlin, a medical doctor and

pathologist.  He testified that he observed Katherine's body at the scene of the murder, attended

the autopsy, and reviewed the autopsy report and photographs.[94]  (The doctor who performed the

autopsy, Dr. J. Cobb Malin, testified in the abbreviated guilt phase.[95])  He testified that Katherine

had 38 identifiable stab wounds that were large enough to be counted and several smaller ones,

all of which were inflicted before she died.[96]  As noted by the Ninth Circuit, Ritzlin, testified

that:

> Ms. Carlson suffered several different types of knife wounds during the attack: three
> potentially fatal wounds to the chest; a number of defensive wounds on Ms. Carlson's
> hands and arms; and a third type of wound that Dr. Ritzlin described as "punctate"
> wounds—small, superficial cuts where the skin had been punctured, consistent with the
> victim having been poked with a knife.  Dr. Ritzlin concluded that these superficial
> puncture wounds were non-fatal and non-defensive in nature.  On that basis, he
> concluded that Ms. Carlson had been tortured before being killed.

*Williams*, 908 F.3d at 574.

2.  Mitigation evidence presented a trial

O'Neill's case for mitigation consisted of the testimony of several friends and relatives

who described Williams' redeeming qualities and provided information about his upbringing in

South-Central Los Angeles.

---

[91] *Id*. at  9-11.

[92] *Id*. at 11-12.

[93] *Id*. at 13-17.

[94] *Id*. at 28-29.

[95] ECF No. 263-7 at 89-104.

[96] ECF No. 173-7 at 30.

Williams' aunt, Inez Kelly,[97] provided family background information and explained that Williams and his siblings lived with her after his mother died when he was nine years old.[98]  She testified that Williams, as the eldest, would take care of his four younger sisters and that he was "so sweet."[99]  She also testified that Williams was very close with his grandmother, Lois Williams, and that when he was about 12, he went to live with Lois and her daughter, Katheryn Carter.[100]  She further testified that, when he was about 15 or 16, Williams moved in with his aunt, Jean Williams.[101]

Williams' sister, Cynthia Williams, testified about living in several different homes during their childhood and described her close relationship with Williams.[102]  She explained that she only saw her and Williams' biological father one time after her mother died, that Williams was the closest thing she had to a father, and that Williams was in charge of taking care of her and her sisters.[103]  Another sister, Latonia Enge, also testified about Williams taking care of her and her sisters.[104]  A third sister, April Enge, testified that Williams should not be sentenced to death because he was a good person and that he was never mean to her.[105]  Williams' then-fiancée, Maurica Hawkins, testified that Williams should not be sentenced to death because "you

---

[97] Inez Kelly identified herself as Inez Armstrong when she testified at the penalty hearing but later provided a declaration for Williams' post-conviction proceedings under the name Inez Kelly, which is also the name that appears in the Ninth Circuit's decision remanding this case.  So, to avoid confusion, I refer to her here as Inez Kelly.

[98] ECF No. 173-7 at 43-44.

[99] *Id*. at 44-46.

[100] *Id*. at 51.

[101] ECF No. 173-8 at 3.

[102] *Id*. at 15-17.

[103] *Id*. at 19-20.

[104] *Id*. at 31-33.

[105] *Id*. at 26-37.

shouldn't take a life for a life" and because "he is young and he hasn't begun yet to live his life."[106]

Williams' aunt, Mozelle Washington,[107] testified about Williams coming to live with her for about three months when Jean Williams was not getting along with her husband.[108] She described some of Williams' redeeming qualities, but also noted that he had some personal troubles and that he had a difficult upbringing because there was "a lot of women and not enough boys in the house."[109] She also testified that Williams lost both his grandmother and his Uncle John (Mozelle's husband), two people he loved dearly, within seven months in 1980 (when Williams was 17 years old). Williams' great uncle, Jessie Williams, testified that he had employed Williams for four years and described him as smart, reliable, and the best worker he had ever seen.[110] He further testified that Williams should not receive the death penalty because he had not had a chance to grow up.[111]

Williams' close friend, Russell Duckworth, testified about he and Willams lifting weights together and going to community college together.[112] He also testified about the rough neighborhood he and Williams lived in and their desire to get out of it.[113] Williams' former neighbor, Danine Perry, testified about Williams helping her fix up her house and take care of her children even though they did not know each other.[114] She also commented on how rough

---

[106] *Id*. at 40.

[107] This is the same aunt who testified as Mozelle Williams in Williams' state post-conviction proceedings.

[108] *Id*. at 48.

[109] *Id*. at 50.

[110] ECF No. 173-9 at 6.

[111] *Id*. at 8.

[112] *Id*. at 14-15.

[113] *Id*. at 16-17.

[114] *Id*. a 21.

their neighborhood was and confirmed that there was parts of it "where white people would fear to go."[115]

Williams testified about his family and the people who raised him.[116]  He testified about attending numerous schools growing up and then briefly attending community college until he was shot in a drive-by shooting.[117]  According to his testimony, he then moved San Diego for a short time, where he worked mixing cement and cleaning up parks.[118]  He returned to Los Angeles but did not want to stay, so he used connections he had established while boxing in the Job Corps program a few years earlier to relocate to Reno.[119]  He testified about living with his boxing manager in Horizon Hills, training for boxing, and working as a maintenance person in the subdivision prior to the murder.[120]  He also testified about his daily drinking and marijuana use at the time of the offense.[121]  He recounted the circumstances of the murder and claimed that it was the result of him panicking upon finding Katherine in what he assumed was an empty house.[122]  He also described what happened afterward and how he turned himself in.[123]

The defense's final witness was Jean Williams, the aunt Williams lived with in his late teens.  She testified that she was aware of Williams' crimes and misbehavior as a juvenile and tried to straighten him out by talking to his probation officer, trying to send him to camp, and

---

[115] *Id*. at 24.

[116] *Id*. at 28-29.

[117] *Id*. at 29-31.

[118] *Id*. at 31- 32.

[119] *Id*. at 32-34.

[120] *Id*. at 34-35.

[121] *Id*. at 41.

[122] *Id*. at 40-45.

[123] *Id*. at 46-51.

consulting with him.[124]  She also testified that she was aware of how gruesome the murder was but that she still loved Williams and thought he should be given a second chance.[125]

### 3.  Mitigation evidence presented in federal habeas proceedings

The Ninth Circuit's opinion faulted O'Neill for presenting a mitigation case that "portrayed Williams as a thoughtful and dutiful child who grew up with the support of a loving family, despite being 'bounced around a little bit' between homes and schools." *Williams*, 908 F.3d at 567.  The opinion noted that, "[i]n light of Williams' proffered evidence, we now know that an adequate investigation would have revealed an upbringing marred by violence and upheaval, and a family life rife with abuse and neglect." *Id*.  The opinion includes an overview of what the proffered evidence would have demonstrated.  The proffered evidence included 15 declarations from relatives and friends and expert reports prepared in 1999 by Dr. David Schmidt, a clinical neuropsychologist, and Dr. Dennis DePry, a psychiatrist.

As a starting point, I find, for reasons that follow, that much of the Ninth Circuit's overview of the proffered evidence was not borne out by the evidence presented to this court on remand.[126]  The overview begins with a paragraph detailing the physical abuse inflicted by Williams' stepfather, Tommy Enge, "beginning when Williams was five years old." *Id*. at 567-68.  It includes a statement that "Williams' sister remembers one occasion on which Mr. Enge beat an eight-year-old Williams 'like he was hitting a man.'" *Id*. at 568.  Three of Williams' sisters (Cynthia, Yolanda Williams, and Latonia) mentioned Enge being physically abusive in their declarations, but none of the three mentioned it when they testified at the evidentiary

---

[124] ECF No. 173-10 at 43.

[125] *Id*. at 43-45.

[126] On this point, I note the various expert reports admitted at the hearing mention some of the same events and occurrences contained in the Ninth Circuit's overview.  But those reports rely heavily on secondhand sources that were not admitted as an exhibit or on interviews with Williams, who did not testify at the hearing.  Indeed, two of the experts relied heavily on "social history" reports that were not only not admitted as exhibits, but have not been provided to this court in any form. Exhibits 13 and 16. When cross-examined at the evidentiary hearing, neither expert was able to identify who had drafted the reports. ECF No. 329 at 76; ECF No. 330 at 82.

hearing.[127]  In fact, Latonia characterized the household with her mother, Sophia, and Enge as "nothing but love" and "the happy house."[128]  Also, the "like he was hitting a man" quote did not come from one of Williams' sisters but instead from the declaration of Williams' Aunt Katheryn,[129] which was not admitted as an exhibit at the hearing.  So, while Tommy Enge may have been physically abusive, there is only secondhand support for it in the admitted evidence.[130]

The Ninth Circuit opinion then discusses the abuse and neglect the kids endured when they were taken in by Aunt Inez and her husband Roosevelt after Sophia's death.  *Williams*, 903 F.3d. at 568.  This was better supported with evidence presented at the hearing, but not quite as dramatically as portrayed in the opinion.  Williams' sisters and his Aunt Jean testified at the hearing about Inez whipping the children with extensions cords and making them stay in a dark closet for hours.  With respect to the latter, however, Latonia testified that Williams did not get the closet punishment,[131] and neither Aunt Jean or Cynthia could say whether he did or did not.[132]  There is also a lack of direct evidence that Roosevelt "frequently beat Williams," as the Ninth Circuit stated in its opinion. *Williams*, 908 F.3d at 568.  Aunt Jean testified that she did not know whether Roosevelt ever hit Williams.[133]  Yolanda testified that she "believe[d] there was one time they had a physical altercation."[134]  Latonia testified that Williams escaped to his Uncle

---

[127] The final sister, April, is deceased but her declaration was admitted as an exhibit at the hearing (Exhibit 25).  Her declaration does not mention any abuse, but she likely would not have been old enough to remember events that occurred while the family lived with Enge.

[128] ECF No. 328 at 93.

[129] ECF No. 136-3 at 141.

[130] For example, the reports of Dr. DePry and Dr. Schmidt, which were admitted as exhibits at the hearing, both mention Enge's abusiveness. Exhibit 10 at 6; Exhibit 11 at 2.

[131] ECF No. 328 at 101.

[132] *Id*. at 31, 134.

[133] ECF No. 328 at 33.

[134] *Id*. at 49.

Jessie's house when Roosevelt "beat him up pretty bad,"[135] but did not mention any other beatings.  In her testimony, Cynthia also mentioned only one physical altercation between the two, after which Williams went to live with his uncle.[136]  The quote in the opinion about Roosevelt hitting Williams "like he was hitting a punching bag" (*Williams*, 908 F.3d at 568) comes from Cynthia's declaration describing the same incident.[137]  April's declaration, which was admitted as an exhibit because she is deceased, states that it was usually Inez who imposed the punishment, but that sometimes it was Roosevelt.[138]  Her declaration also mentions Williams running away at about 12 years old after being beaten by Roosevelt.[139]  So, the evidence clearly supports a beating that caused Williams to run away to Uncle Jessie's, but not frequent beatings.[140]

The Ninth Circuit's opinion also twice mentions Williams being left helpless to prevent the sexual abuse of his sisters -- once in reference to Roosevelt and once in reference to Aunt Katheryn's husband Larry Joe Carter. *Williams*, 908 F.3d at 568.  The hearing testimony, however, does not support a finding that the sexual abuse was a prevalent or pronounced as the opinion suggests, or that it had a significant impact on Williams.  With respect to Roosevelt, Yolanda testified that he tried to inappropriately touch Cynthia and that he tried to touch her "one time," but never tried again after she reported it to Inez.[141]  Cynthia's only testimony on the subject was that Roosevelt "touched me and Yolanda before" and that Inez didn't do anything

---

[135] *Id*. at 105-06.

[136] *Id*. at  138-39.

[137] ECF No. 136-3 at 241-42.

[138] Exhibit 25 at 4.

[139] *Id*.

[140] I also note that the declaration of Inez's neighbor at the time, which was admitted as an exhibit at the hearing, indicates that Roosevelt's presence in the home was sporadic.  Exhibit 23 at  2,4.

[141] ECF No. 328 at 50.

when she told her about it.[142]  Neither sister mentioned whether Williams was aware of the incidents.  With respect to Larry Joe Carter, Yolanda testified that he was a "pedophile" who "would always try to break in the bathroom on the girls when they were trying to take baths" and "tried to make it a game where it would be a feely-touchy-type thing where he's trying to play with you."[143]  Latonia testified that he was a "like a sexual predator" who "would be trying to feel on your body parts" and "trying to give a sneak feel."[144]  Cynthia testified that Larry Joe would "touch and feel on us."[145]  Of the three sisters, only Cynthia testified about informing Williams about Larry Joe's conduct[146] and none of them testified about what impact it may have had on Williams.  April's declaration does not mention any sexual abuse at all.[147]

The hearing testimony shows that Aunt Jean's husband, Lawrence Enge, was a threat to the Williams' sisters and Aunt Jean.[148]  However, it also shows that, rather than feeling helpless, Williams (who was around 17 years old at the time) would confront Lawrence and "call him out to fight like a man."[149]

Finally, the Ninth Circuit opinion discusses violence, drug use, and suicide attempts that occurred in Willams' teenage years. *Williams*, 908 F.3d at 569.  Much of this information appears to have come from what Williams told Dr. DePry or Dr. Schmidt when they evaluated him in 1999[150] and is either not corroborated or contradicted by other evidence presented at the

---

[142] *Id*. at 126.

[143] *Id*. at 57-58.

[144] *Id*. at 111.

[145] *Id*. at 141.

[146] *Id*. at 142.

[147] Exhibit 25.

[148] *Id*. at 62, 116, 146.

[149] *Id*. at 116.

[150] Exhibit 10 at 3,8; Exhibit 11 at 4.

hearing. For example, there was no evidence or testimony presented at the hearing about a group of teenagers placing a sawed-off shotgun in Williams' mouth, with him being saved by a passing police car and returning home to find his family already mourning his death. And, while medical records show that Williams was shot two different times (once in the leg and once in the side of his chest), they also show that he did not undergo three surgeries to remove the bullet from his chest as the opinion indicates. Instead, they show that, after initially being treated at the hospital, Williams opted not to have the bullet removed because it did not seem to bother him.[151] When it did start to bother him a few months later, he had it removed from under his rib in a single, uneventful surgery, with him being released from the hospital the following day.[152]

The information about Williams' alcohol and drug abuse is well-supported by evidence and testimony presented at the hearing, but there is no credible evidence to support a finding that he attempted to commit suicide by overdosing on sleeping pills when he was 16 years old. As for the car wreck when Williams was 18 years old, Cynthia, Aunt Jean, and Yolanda all mentioned it in their declarations, but not in their hearing testimony. Only Cynthia's declaration suggests that it was a suicide attempt in response to the death of Williams' grandmother.[153] In addition, the declarations also indicate that Williams was drunk at the time[154] and fled the scene.[155] And, none of the declarations mention a "severe head injury" (or any injury at all), and one of the declarations states that Williams was "unhurt."[156]

While the evidence presented on remand does not fully substantiate the Ninth Circuit's overview of Williams' childhood and adolescence, the evidence does add considerable weight to

---

[151] Exhibit 35 at 17, 35.

[152] *Id*. at 34-36.

[153] ECF No. 136-3 at 245-46.

[154] *Id*. at 245-6, 273.

[155] *Id*. at 245-46, 257.

[156] *Id*. at 245-6, 257, 273.

the mitigation case O'Neill presented at Williams' trial.  Without question, Williams' upbringing included traumatic events, abuse, and neglect that O'Neill failed to convey to the three-judge panel.  Beyond what I discuss above in relation to the Ninth Circuit's overview, the evidence revealed the following details of that upbringing.

Sophia gave birth to Williams when she was 16 years old.[157]  Williams' father was married at the time and was never a significant presence in Williams' life.[158]  Over the next six years, Sophia had a daughter (Cynthia) with the same father, a second daughter (Yolanda) by a different father, and two more daughters (Latonia and April) with Tommy Enge, whom she married. [159]  As noted above, there is conflicting evidence as to what life was like for Sophia and the children while living with Enge.  One thing is certain, however: Williams' life was soon turned upside down by Sophia's death when he was 9 years old.

Working as a nurse at the time, Sophia was diagnosed with cancer when she was 26 years old.[160]  Williams was extremely close to his mother and was devastated when she passed away a few days before Christmas.[161]  Cynthia remembers Williams trying to pull their mom out of the casket at the funeral.[162]  And, although he was only 9 years old, Williams felt that it was his responsibility to take over the care of his four younger sisters.[163]  His countenance became much more serious and he was no longer a "happy-go-lucky" child.[164]

Rather being allowed to grieve the passing of their mother in a supportive atmosphere,

---

[157] Exhibits 26 and 35.

[158] ECF No. 328 at 22; Exhibit 26 at 3-4.

[159] Exhibits 28-31, 48.

[160] ECF No. 328 at 69-70.

[161] Exhibit 22 at 1; ECF No. 328 at 85, 128.

[162] ECF No. 328 at 128.

[163] *Id*. at 79-80, 85.

[164] *Id*. at 85, 97.

Williams and his sisters were taken in by an aunt who was clearly not looking out for their best interests. Aunt Inez, who lived in Englewood with Roosevelt, was extremely strict with the children, giving them numerous chores to complete and not permitting them to play outside when she was not home.[165] She also kept her and Roosevelt's food separate from the children's and confined the children to certain parts of the house.[166] Yolanda was Inez's favorite and was treated better than the others.[167] Williams, on the other hand, was tasked with taking care of his younger siblings and often took the blame, and the punishment, for their misconduct.[168] As noted above, Inez's chosen punishment was a whipping with an extension cord, which left scars on Williams, Cynthia, and Latonia that they still have.[169] In addition, the relationship between Inez and Roosevelt was beset with physical violence, alcohol abuse, and infidelity, which added yet more trauma to the lives of Williams and his sisters.[170]

After the violent altercation with Roosevelt when he was about 12 years old, Williams moved to Aunt Jean's apartment while his sisters remained with Inez and Roosevelt.[171] He left there after a few months to live with Aunt Katheryn and Larry Joe Carter in Watts.[172] That household included Grandma Lois, the Carters' children, and various other relatives.[173] Soon thereafter, Williams' sisters (except for Yolanda) joined him there.[174] The abuse and neglect of

---

[165] *Id*. at 28, 46, 99, 131; Exhibit 23 at 1.

[166] ECF No. 328 at 28, 99; Exhibit 25 at 1-2.

[167] ECF No. 328 at 28, 102-03.

[168] *Id*. at 28-29, 48, 135; Exhibit 23 at 1, 3-4.

[169] ECF No. 328 at 30, 99-100, 132-33; Exhibits 47 and 49.

[170] ECF No. 328 at 103, 106, 135-36; Exhibit 25 at 3.

[171] Exhibit 22 at 2; Exhibit 25 at 4.

[172] ECF NO. 328 at 107; Exhibit 22 at 2.

[173] ECF No. 328 at 31, 52-54, 108.

[174] *Id*. at 54-56; Exhibit 25 at 4-5.

Williams and his sisters continued at the Carters, who were more concerned with the children's social security benefits than their well-being.[175]  Like Inez, Katheryn imposed odd rules regarding food, restricting the children's access to food reserved for Larry Joe and making them eat "different food" than her and Larry Joe.[176]  Larry Joe wanted to be in charge of the children's social security checks.[177]  When the checks arrived each month, the adults in the house would get in physical fights over them.[178]  The children's needs were secondary, with Grandma Lois being the only adult who would make sure they were provided for.[179]  Larry Joe and Katheryn would also try to take Grandma Lois' money, so Williams would try to protect her, which was another source of friction between him and Larry Joe.[180]  On one occasion, after he had left to stay with his Uncle John, Williams got into a physical fight with Katheryn, Larry Joe, and another aunt when he returned to claim his check.[181]

After staying at Aunt Katheryn's house for a few years, Williams left to live with Aunt Jean and Lawrence in Compton.[182]  For varying periods of time, his sisters lived there with him after Katheryn's house caught fire in 1980.[183]  Jean was not physically abusive, but she made the

---

[175] *Id*.

[176] ECF No. 328 at 32, 110-11, 140-41.

[177] *Id*. at 34.

[178] *Id*. at 34, 110.

[179] *Id*. at 110.

[180] *Id*. at 56-59.

[181] *Id*. at 142-43.  The Ninth Circuit's opinion states that "[t]he Carters beat Williams and his sisters for a range of small infractions." *Williams*, 908 F.3d at 568.  The declaration of April Enge makes some reference to this (Exhibit 25 at 6) but none of the three sisters who testified at the evidentiary hearing mentioned any of the children being beaten while living with Katheryn and Larry Joe.

[182] ECF No. 328 at 59, 63-64.

[183] Cynthia and Latonia joined him there right after the house fire, and April followed later that year. *Id*. at 112, 144; Exhibit 22 at 6-7.  Yolanda moved over from Inez's when she was in the seventh grade but stayed for only one school year. ECF No. 328 at 60.

Williams' children do all the chores and take care of her children.[184]  Rather than act like a parent figure to Williams, she encouraged him to steal food for the family and took him out to nightclubs.[185]  Lawrence was an alcoholic and smoked marijuana in the house "all the time."[186]  He had a bad temper and on several occasions beat up Jean in front of the children.[187]  Willams stood up for Jean and tried to protect her from Lawrence.[188]  Williams' sisters recognized that Lawrence was a pedophile and resorted to drastic measures to protect themselves, such as sleeping with weapons.[189]  Latonia had to fight off Lawrence on two occasions, but he stopped bothering her after she told her father about the second incident.[190]

Without a doubt, Williams lacked adequate adult supervision, guidance, and support in these various living situations.  By his early teens, he was drinking alcohol and smoking marijuana at least weekly and missing school for several days at a time.[191]  He was arrested for sniffing glue just prior to his fourteenth birthday and, about a month later, was sniffing glue again when he was arrested for battery on a woman who had confronted him after he jumped

---

[184] ECF No. 328 at 60, 114, 145.

[185] *Id*. at 61, 115, 117.

[186] *Id*. at 62; Exhibit 25 at 7.

[187] ECF No. 328 at 116; Exhibit 25 at 8.

[188] ECF No. 328 at 37, 116; Exhibit 25 at 8.

[189] ECF No. 328 at 62, 116-17.

[190] *Id*. at 116-17.  The Ninth Circuit's opinion states that when "Williams and his sisters … returned to live with Aunt Jean and Lawrence," Lawrence "continued to sexually abuse one of Williams' sisters." *Williams*, 903 F.3d at 568.  I respectfully note that this a mischaracterization of the information contained in the declarations submitted to the Ninth Circuit.  First, there is no indication in the declarations that any of Williams' sisters accompanied Williams when he briefly lived with Aunt Jean and Lawrence the first time.  Second, only Latonia's declaration mentions being sexually abused by Lawrence and, consistent with her hearing testimony, it recounts only the two attempted molestations before she told her father about it. ECF No. 136-3 at 184.  Indeed, she testified that the second incident may have occurred the day after the first. ECF No. 328 at 116-17.

[191] Exhibit 22 at 2; Exhibit 33 at 4-5, 6.

over her fence and tried to grab her 3-year-old daughter.[192]  When Williams was taken for medical treatment after this incident, Aunt Jean signed him out of the hospital against medical advice.[193]  A psychiatrist who evaluated Williams a few months later recommended individual and group psychotherapy,[194] but there is no evidence that was ever provided to him.

Without any meaningful adult intervention or treatment, Williams' substance abuse, truancy, and criminal activity continued for the next few years as he bounced from school to school.[195]  When he did attend school, he put forth little effort and was disruptive in class.[196]  When he was 16 years old, Williams entered the Job Corps program in Reno for a few months before resigning when faced with a disciplinary action and returning to Los Angeles.[197]

In March of 1980, just before Williams turned 17, Grandma Lois died.[198]  She had been like a "second mom" to the Williams children and was the adult who had provided the most love and support for Williams.[199]  Williams took her death very hard.[200]  He was arrested for robbery a few months later and ordered to attend a camp for juvenile offenders.[201]  Shortly thereafter, he was dealt another blow when his Uncle John died in November 1980.[202]  Williams was also very close to Uncle John, a positive role model for him who would visit him often and take him

---

[192] Exhibit 33 at 2-3.

[193] Exhibit 35 at 4.

[194] Exhibit 36 at 5-6.

[195] Exhibits 32, 33, 34; ECF No. 330 at 54.

[196] Exhibits 33, 34.

[197] Exhibit 33 at 73; Exhibit 39 at 24, 31.

[198] ECF No. 328 at 118.

[199] ECF No. 328 at 35, 62, 119.

[200] *Id.*; Exhibit 25 at 8.

[201] Exhibit 33 at 97, 100.

[202] ECF No. 328 at 118.

places.[203]  Williams' relatives say that his demeanor changed for the worse after the two deaths and that he started hanging out with the wrong people.[204]  Even so, he reportedly did well at the camp, making "excellent progress" in his behavior, work habits, and academics and graduating from the 18-week program in March of 1981.[205]  After his brief stints attending community college and working in San Diego, Williams moved to Reno a few months before his 19th birthday.

As for evidence of brain damage, the Ninth Circuit noted that Dr. Schmidt "reported that Williams' brain damage likely hampered his 'ability to anticipate the long term consequences of his actions' and made him 'more likely to act-out in a criminal manner.'" *Williams*, 908 F.3d at 561–62.  The court further noted that "Dr. DePry concurred in these diagnoses, and added that Williams suffered from mixed personality disorder with dependent and schizoid traits." *Id.* at 562.  On remand, Williams presented the testimony and findings of Paul Connor, Ph.D., a clinical neurospsychologist who evaluated Williams in 2021.  Because Dr. Schmidt is deceased and the data supporting his report are no longer available, Dr. Connor was asked "to readminister as many of the same tests as possible from the 1999 evaluation."[206]  Williams also presented the deposition testimony of Dr. Erin Bigler, another neuropsychologist, who confirmed that the type of testing conducted by Dr. Schmidt and Dr. Connor could have been conducted in 1982.[207]

In his 1999 report, Dr. Schmidt opined that Williams had suffered sufficient brain damage to cause a change of functioning that "include increased impulsivity, problems with judgment, poor overall problem solving abilities, and difficulty incorporating significant

---

[203] Id. at 35-36, 62, 118-19, 139.

[204] Id. at 36, 63, 144; Exhibit 25 at 8.

[205] Exhibit 33 at 101-02.

[206] Exhibit 5 at 1.

[207] ECF No. 310-2 at 11.

information (e.g., important facts) into his decision making process."[208]  Dr. Connor reached

similar conclusions.[209]  He testified that Williams was "demonstrating mild neurocognitive

deficit, neurocognitive disorder, in multiple domains of functioning, especially visuospatial

abilities, executive functions, planning, problem solving, reasoning, things like that."[210]  He

agreed with Dr. Schmidt that the likely culprit was head injuries Williams had received

combined with polysubstance abuse during his developmental years.[211]  Dr. Connor's

intelligence testing showed that Williams' full scale-IQ is 89 with verbal comprehension in the

average range but processing speed in the low average range.[212]  Overall, Williams performed

well on tests related to language-based skills, overall attention, and motor coordination, but

showed impairment on tests related to processing speed, math, nonverbal intellectual skills,

executive functions, abstract reasoning, and problem-solving.[213]  Both Dr. Connor and Dr. Bigler

noted in their testimony that even a "mild" neurological deficiency can significantly impact an

individual's ability to function in day-to-day life.[214]

When it denied Claim 1(A) on the merits, this court reasoned that "Dr. Schmidt's report

contains information that may have actually hurt Williams' chances for a more lenient

sentence."[215]  The court cited Dr. Schmidt's finding that individuals sharing Williams'

personality profile are "angry, argumentative, and resentful of any demands being placed upon

---

[208] Exhibit 11 at 12.

[209] ECF No. 329 at 155.

[210] *Id*. at 103.

[211] Id. at 115; Exhibit 11 at 12.

[212] ECF No. 329 at 120.  This is consistent with a full scale-IQ score of 90 when Williams was tested in 1982. Exhibit 40 at 4.

[213] Id. at 131-34; Exhibit 9 at 13-16.

[214] ECF No. 329 at 105; ECF No. 310-2 at 11-12.

[215] ECF No. 196 at 11.

them" and may "become hostile and angry [when] their expectations are not met."[216]  That finding was based on the result of a Minnesota Multiphasic Personality Inventory - 2nd Edition (MMPI-2) that Dr. Schmidt had administered.[217]  James N. Butcher, Ph.D, a psychologist who administered the prior version of the MMPI on Williams just before his trial in 1982, produced a report with similar, and even more troubling, findings.  According to that report, individuals with Williams' personality profile are "among the most difficult criminal offenders," "tend to have antisocial, aggressive, and hostile attitudes toward others," and "engage in violent crimes against other people."[218]  The report also states that these individuals present "a difficult case for rehabilitation," may require "segregate[ion] from weaker inmates during incarceration," and are "not likely to benefit much from individual insight-oriented psychotherapy." [219]  Both reports contain disclaimers as to the validity of the profile, but the similarity of their findings cannot be overlooked.  And, while both Dr. Connor and Dr. Bigler testified about the MMPI in the general sense, neither expert addressed the personality profile findings of Dr. Schmidt or Dr. Butcher.

Finally, Williams presented the testimony and reports of two additional experts -- Cheryl Paradis, Psy.D, a clinical and forensic psychologist, and Jorja Leap, Ph.D., an expert in social work and psychocultural studies within anthropology.  Prior to the evidentiary hearing, the respondents moved to exclude this testimony on the grounds that Williams' habeas petition does not allege that counsel was ineffective by failing to present such testimony and the testimony is beyond the scope of the Ninth Circuit's remand.[220]  I agreed that the respondents' arguments had some merit, but decided to allow the testimony while reserving judgment as to what weight, if

---

[216] Id. (citing ECF No. 136-3, p. 110).

[217] Exhibit 11 at 5-6.

[218] Exhibit 40 at 2.

[219] Id.

[220] ECF No. 305.

any, I would give it.[221]

Dr. Leap was asked to look at "the relationship between Mr. Williams, what occurred in his family, what occurred in his life trajectory, and the interaction of that with the surrounding environment in South Los Angeles," and to offer an expert opinion on the impact those factors taken together had "on self-determination and agency."[222]  She identified and discussed four themes relevant to understanding Williams' life history: (1) attachment, separation, loss; (2) community violence; (3) agency and trauma; and (4) institutional failure.[223]  Among her conclusions was that the losses and traumas Williams experienced, the violence and lawlessness of his environment growing up, and his untreated substance abuse and mental health issues all combined to deprive him of control over his own life (i.e., agency) and "the ability to judge the dangerousness of a situation or the damage it could engender."[224]

While Dr. Leap's testimony and report may have provided some insight into the factors contributing to Williams' conduct, I am not convinced that I can consider it as part of my prejudice analysis.  The Ninth Circuit's mandate is that I am to "consider 'the totality of the available mitigation evidence,' including the evidence of brain damage." *Williams*, 908 F.3d at 571.  Read in context, this is limited to the evidence supporting Claims 1(A), 1(F), and 1(H).  Claim 1(F) of Williams' petition refers to "competent expert evaluation" but cites only the reports of Dr. Schmidt and Dr. DePry.[225]  In addition, Williams has not demonstrated that testimony similar to that provided by Dr. Leap was "available mitigation evidence" in 1982, at least not in the sense that it was the type of evidence capital attorneys were expected to present under the "prevailing professional norms" of the time. *See Strickland*, 466 U.S. at 688.  He cites

---

[221] ECF No. 316 at 2.

[222] ECF No. 330 at 28.

[223] *Id*. at 37-80.

[224] Exhibit 16 at 43-44.

[225] ECF No. 135 at 53.

to some sources that, according to him, "recognize that social workers and psychosocial expertise were being used as early as 1981 to provide context to a defendant's life,"[226] but he makes no showing that it was common practice.

Dr. Paradis was asked "to evaluate the case in terms of what a competent mental health professional would have done in … the early 1980s in terms of evaluating Mr. Williams to assess the presence of trauma and how it affected him and … what a competent mental health professional would have testified to at the sentencing phase."[227]  She identified and discussed five categories of trauma Williams experienced: (1) loss, (2) physical abuse, (3) emotional abuse, (4) neglect, and (5) additional trauma outside of the home.[228]  Summarizing her conclusions, she testified that a competent mental health professional at the time of Williams' trial would have testified that "Williams suffered severe losses and severe traumas that affected him greatly psychologically, that he developed psychiatric illness, and that he did not receive the treatment he needed," all of which was exacerbated by substance abuse.[229]  In addition, she opined in her report that a competent professional could have testified that Williams' criminal behavior "stemmed from the many traumas he experienced interacting with the circumstances he faced at the time of the instant offense."[230]

While the evidence presented through Dr. Paradis is marginally closer to the type of evidence I am to consider on remand, the respondents established on cross-examination that her report and testimony were largely based on unconfirmed information and focused on events that fit her narrative, while ignoring those that did not.[231]  Among other things, cross-examination

---

[226] ECF No. 336 at 28.

[227] ECF No. 329 at 15-16.

[228] *Id*. at 20-44.

[229] *Id*. at 72-73.

[230] Exhibit 13 at 55.

[231] ECF No. 329 at 74-87.

revealed that she did not interview family members (she just read their declarations) and did not know who prepared the social history memorandum that she relied on as a source for her report.[232]  It also revealed that she knew very little about the various programs and special schools Williams had been enrolled in as part of his juvenile probation.[233]  She noted in her report that Uncle John was the only positive male role model in Williams' life, but made no mention of Uncle Jessie and was not aware that Uncle Jessie had testified on Williams' behalf at the penalty hearing.[234]  She also selectively quoted portions of the 1982 MMPI report that supported her ultimate conclusions and overlooked the more troubling aspects of the report discussed above.[235]  In sum, it is likely the three-judge panel would have found ample reasons to question the validity of Dr. Paradis' report and testimony.

### 4. Reweighing

As noted, the two aggravating circumstances remaining in this case are: (1) Williams committed the murder for the purpose of avoiding and preventing his lawful arrest and (2) the murder involved depravity of mind and torture.  Even without the two stricken aggravating circumstances, which were "in effect one significant aggravator based on the circumstances of the killing,"[236] these two aggravating circumstances far outweigh the lone mitigating circumstance.  Thus, like the Supreme Court of Nevada, I conclude beyond a reasonable doubt that the three-judge panel would have found Williams death-eligible without the two stricken aggravating circumstances.

Williams argues that the torture and depravity of mind aggravator should not be part of my reweighing analysis because the depravity of mind portion has been ruled unconstitutional by

---

[232] *Id*. at 75-76.

[233] *Id*. at 78-80.

[234] *Id*. at 82-83.

[235] *Id*. at 83-85; Exhibit 13 at 32-33.

[236] ECF No. 145-2.

the Supreme Court, the Ninth Circuit, and the Supreme Court of Nevada, and the testimony

supporting torture was "successfully impeached."[237]  This argument lacks merit.  First, the

torture and depravity of mind aggravating circumstance has not been stricken in this case.

Williams raised a challenge to the aggravator as Claim 15 of his habeas petition,[238] but this court

determined the claim was barred by the doctrine of procedural default.[239]  That determination

was affirmed by the Ninth Circuit on appeal. *See Williams*, 908 F.3d at 580 ("Because Nevada

Revised Statutes § 34.726 is an independent and adequate state procedural bar to federal review,

we affirm the district court's order dismissing the following claims: 3, 5–7, 10–13, 15, and 17–

38.").

Second, the aggravator has been successfully challenged in other cases, but only the

depravity of mind aspect of the aggravator has been invalidated. *See Valerio*, 306 F.3d at 751

("We held that the torture and mutilation parts of the instruction were 'sufficiently clear and

objective to satisfy the requirements of *Godfrey*,' but held that the depravity of mind part of the

instruction was unconstitutionally vague.").  Here, the three-judge panel found both depravity of

mind and torture.[240]  While this court previously found that O'Neill effectively cross-examined

Dr. Ritzlin's testimony on the issue of torture, the court did not rule that there was insufficient

evidence to support torture as an aggravating circumstance.[241]  O'Neill's cross-examination

notwithstanding, Dr. Ritzlin's testimony together with autopsy photographs[242] provided

sufficient evidence to support the three-judge panel's decision on torture.  Finally, Williams

[237] ECF No. 300 at 3-6; ECF No. 336 at 39 (both citing *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980); *Valerio v. Crawford*, 306 F.3d 742, 750–51 (9th Cir. 2002) (en banc); and *Robins v. State*, 798 P.2d 558, 570 (Nev. 1990)).

[238] ECF No. 135 at 112-14.

[239] ECF No. 165 at 15.

[240] ECF No. 173 at 4.

[241] ECF No. 196 at 15-16.

[242] ECF No. 333.

attempts to analogize this case to *Valerio* and a Nevada state supreme court case, *Chappell v. State*, 972 P.2d 838, 842 (Nev. 1998).  But in *Valerio* the prosecutor conceded the evidence did not support a finding of torture (306 F.3d at 762), and in *Chappell*, unlike in this case, "there [was] no evidence that Chappell stabbed [his victim] with any intention other than to deprive her of life" (972 P.2d at 842).

Having reweighed "the totality of the available mitigation evidence" against the evidence in aggravation, I conclude that the mitigation evidence would not have significantly "altered the sentencing profile" presented to the three-judge panel. *See Strickland*, 466 U.S. at 700.  Thus, the available mitigating evidence does not satisfy the "high bar" established by the Supreme Court for granting relief in cases "involving claims of ineffective assistance of counsel at the penalty phase of a capital trial." *See Shinn v. Washington*, 46 F.4th 915, 931 (9th Cir. 2022) (citing *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 F.3d 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009)); *see also Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011) ("Even the more complete picture portrayed in the proffer of Rhoades's dysfunctional family with its alcoholism, abuse, aberrant sexual behavior, and criminal conduct does not depict a life history of Rhoades himself that is nightmarish as it was for the petitioners in cases such as *Rompilla*, *Wiggins*, and *Williams* . . . .").

I cannot overlook that the victims in this case were a nurse in her mid-20s and her unborn child, who were brutally murdered in their own home. *See Ochoa v. Davis*, 50 F.4th 865, 900 (9th Cir. 2022) (citing the fact that Ochoa's two victims were "very sympathetic" as a reason Ochoa failed to establish *Strickland* prejudice).  Her husband, a firefighter, came home from working all night to discover that his young family had been taken from him in an unspeakably grisly manner.  In short, it is hard to envision more sympathetic victims than those in this case. Next, this is not a case in which the sentencer heard practically no mitigating evidence. *Cf. Rompilla*, 545 U.S. at 378, ("Rompilla's evidence in mitigation consisted of relatively brief testimony …"); *Wiggins*, 539 U.S. at 516 ("At no point did [counsel] proffer any evidence of

petitioner's life history or family background.").  As recounted above and in this court's prior order denying habeas relief, the three-judge panel heard extensive testimony about "the adverse conditions Williams faced growing up in violent and crime-ridden communities in southern California," which included the death of his mother when he was 9 years old, the responsibility of taking care of his sisters as they bounced from home to home, falling into substance abuse and being the victim of a drive-by shooting, and the loss of two of the family members closest to him when he was 17.[243]  The panel also heard about Williams' more positive attributes and his efforts to improve his situation.[244]

What the three-judge panel did not hear about was the abuse and neglect Williams was subjected to in his various living situations or the full extent of his substance abuse and mental health problems.  On remand, Williams was provided the opportunity to further develop the evidence in these areas, but much of the evidence he presented was conflicting or confusing.  For example, testimony about how the Williams children were treated during their stays with various relatives varied significantly depending on the witness' perspective.  While Aunt Jean and most of Williams' sisters described the unfavorable conditions at Aunt Inez's, Yolanda testified that Inez loved and took care of all the kids and that Williams was "happy there" and "had his friends to hang out with."[245]  Similarly, most of the sisters described being mistreated by Aunt Jean, but Cynthia testified that Aunt Jean made them feel welcome and did not treat them "like a commodity" or try to take their money.[246]  All the siblings seemed to agree that life at Aunt Katheryn and Larry Joe's was a crowded mess where they were either ignored or treated poorly while the adults fought over their social security benefits, but April states in her declaration that Williams "stayed there off and on, but never for a very long at a time" and was, instead, "shifting

---

[243] ECF No. 196 at 9-10.

[244] *Id*.

[245] ECF No. 328 at 45-46, 51-52.

[246] Id. at 145-46.

around from my aunt Jean's, to my uncle John's, to my aunt Mozelle's, to my uncle Jessie's."[247] And because the siblings were scattered among various relatives at different times (especially after Williams left Inez's home at 12 or 13), I am able determine whether Williams witnessed or endured much of what his sisters and Aunt Jean testified about.  For example, Cynthia testified that Lawrence tried to touch her inappropriately when she lived at Aunt Jean's house, but when asked whether Williams was able to protect her, she responded that he was not living there anymore.[248]

I further find that the brain damage evidence O'Neill could have presented at Williams' penalty hearing does not add significant weight to his case for mitigation.  The evidence does not show that his ability to appreciate the wrongfulness of his conduct at the time of the offense was significantly impaired.  And while I accept as true Dr. Connor and Dr. Bigler's testimony that even mild neurological impairment can significantly impact a person's ability to function in day-to-day life, neither expert testified that Williams' brain damage prevented him from controlling his conduct.

On balance, the evidence shows that most of the adult caretakers in Willams' life failed to provide him with the nurturing environment a child needs and deserves, especially a child who has lost his only true parent at such a young age.  Williams also experienced physical abuse that no child should be forced to endure, struggled with substance abuse throughout his adolescence, and, at 17 years old, lost two of the few people he could rely on for love and support.  In a closer case, adding the mitigation evidence Williams presented to this court on remand to the evidence he presented at his penalty hearing might be sufficient to establish prejudice under *Strickland*.  In this case, however, because the evidence in aggravation is so strong, the mitigating evidence would need to depict a life history akin to that presented in *Rompilla*, *Wiggins*, and *Williams*. *See Rhoades*, 638 F.3d at 1051-52 (comparing the mitigating evidence to the aggravating evidence in

---

[247] Exhibit 25 at 5.

[248] ECF No. 146-47.

those Supreme Court cases).  Williams had a very difficult childhood, but the evidence falls far

short of showing a "life history" as "nightmarish as it was for the petitioners in [those] cases."

*Id*.; *see also Washington v. Shinn*, 46 F.4th at 934 (finding that Washinton's mitigating evidence

"is not nearly as substantial or extreme as the mitigating evidence in the four Supreme Court

decisions").  In sum, "the aggravating circumstances were too strong, and the new mitigating

evidence added too little, to create a reasonable probability of a different outcome." *Id*. at 1049.

Claims 1(F) and 1(H) are denied.

      <u>Claim 1(J)</u> -- In Claim 1(J), Williams alleges counsel was ineffective by failing to raise

certain objections or file certain motions.  For the most part, Williams claims without elaboration

that he is entitled to relief due to his trial counsel's failure to raise or adequately litigate nearly all

the errors alleged throughout his petition.[249]  The only claim he supports with specific factual

allegations is his claim that counsel was ineffective by failing to establish that Williams'

statements to the police were inadmissible under *Edwards v. Arizona*, 451 U.S. 477 (1981).

Therefore, all of Claim 1(J) except for Williams' IAC claim premised on *Edwards* is dismissed

for failure to state a claim. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-

settled that '[c]onclusory allegations which are not supported by a statement of specific facts do

not warrant habeas relief.'" (alteration in original) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th

Cir. 1994))).

      Williams alleges that O'Neill was ineffective by not presenting evidence to establish that

his statements to the police were taken in violation of *Edwards* and instead allowing the

prosecutor to present his unsworn testimony as to the circumstances of the interrogation.  In

considering an accused's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court in

*Edwards* held "that an accused [who has] expressed his desire to deal with the police only

through counsel, is not subject to further interrogation by the authorities until counsel has been

---

[249] ECF No. 135 at 57-58.

made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85.

In moving to suppress the statements, O'Neill argued that a report compiled by a detective for the Washoe County Sherrif's Office demonstrated that Williams had invoked his right to counsel when asked to take a polygraph examination.[250]  Accordingly, she contended that detectives violated Williams' rights under *Miranda* by taking his statements without honoring his request for counsel.[251]  The State argued that, because Williams had repeatedly waived his rights under *Miranda* up to that point and his request "to see district attorney or an attorney" prior to taking the examination was equivocal, Supreme Court precedent allowed police to clarify with him whether he wanted questioning to stop until he was provided a lawyer.[252]  According to the State, Williams indicated that he was willing to talk without a lawyer present. *Id*.  The trial court denied the motion to suppress.[253]

Williams contends that O'Neill should have presented testimony from Williams and "evidence of [his] neurological and psychological impairments which made him excessively compliant to the demands of authority figures."[254]  He does not describe, however, the testimony he would have provided if given the opportunity.  In addition, he failed to develop any such evidence in state court in the manner prescribed by state law. *See* U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 142 S. Ct. at 1736-37.  Thus, he has not shown that, but for O'Neill's ineffectiveness, there is a reasonable probability that the motion to suppress would have been granted.  Claim 1(J) is denied.

---

[250] ECF No. 173-3 at 17-23.

[251] *Id*.

[252] ECF No. 285-1 at 32-45.

[253] ECF No. 285-2.

[254] ECF No. 135 at 58.

1

2. *Penalty phase admission of custodial statements*

2      As described above, Williams alleges in Claim 9 a violation of his constitutional rights

3  due to the trial court's admission of his statements made in custody after his request to consult

4  with an attorney.  By pleading guilty, Williams waived the claim with respect to the guilt phase

5  of his criminal proceeding.  He argues, however, that the admission of the statements in the

6  penalty phase contributed to the three-judge panel's decision to sentence him to death.

7      In *Smith v. Illinois*, 469 U.S. 91 (1984), a case that was controlling authority at the time

8  Williams' conviction became final, the Court held that the threshold inquiry in determining

9  whether police questioning must stop is whether the accused has "invoked his right to counsel in

10  the first instance." 469 U.S. at 95.  The Court noted that, when the asserted request for counsel is

11  "ambiguous or equivocal," the courts "have developed conflicting standards for determining the

12  consequences of such ambiguities." *Id*.  The Court did not resolve the conflict because, in *Smith*,

13  the "alleged ambiguities or equivocations" neither "precede[d] … [the] request for counsel" nor

14  were they "part of the request itself." *Id*. at 96.

15      Because the state court adjudicated Williams' constitutional claim on the merits, habeas

16  relief may be granted only if the state court's adjudication was contrary to or involved an

17  unreasonable application of clearly established federal law or was based on an objectively

18  unreasonable determination of facts in light of the evidence presented in state court. 28 U.S.C.

19  § 2254(d)(1), (2).  Williams did not demonstrate to the state court that his asserted request for

20  counsel was unequivocal in light of the circumstances that preceded it or the request itself.  Thus,

21  as acknowledged in *Smith*, the standard to be applied to his motion to suppress remained an open

22  question in the Supreme Court.  Accordingly, no clearly established Supreme Court precedent

23  required the state court to exclude the statements, and § 2254(d) precludes relief. *See Carey v.*

24  *Musladin*, 549 U.S. 70, 77 (2006).

25      I also conclude that any error was harmless.  On federal habeas review of a state

26  conviction, the court applies the harmlessness standard announced in *Brecht v. Abrahamson*, 507

27

28

49

U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112 (2007); *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir.), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *see also Sims v. Brown*, 425 F.3d 560, 572-73 (9th Cir. 2005) (assessing under *Brecht* whether admission of statements obtained in violation of *Miranda* likely had substantial and injurious effect in determining capital habeas petitioner's sentence), *amended*, 430 F.3d 1220 (9th Cir. 2005).  Under the *Brecht* harmless error standard, habeas relief may be granted only if a federal court has "grave doubt" about whether a non-structural constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Davis v. Ayala*, 135 S. Ct. 2187, 2197-98 (2015) (citation and internal quotation marks omitted).  A "reasonable probability" that an error was harmful is insufficient. *Id*. at 2198 (quoting *Brecht*, 507 U.S. at 637) (internal quotation marks omitted). A petitioner must have been "actually prejudiced" by the constitutional error to merit federal habeas relief. *Id*. (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)) (internal quotation marks omitted).

In the penalty phase of William's trial, the State presented a transcript and an audio tape of Williams' statement to a detective that included his confession that he killed Katherine.[255] When the State attempted to present a videotape of a statement Williams made in the presence of a sergeant with the sheriff's department, O'Neill objected on the grounds that it was cumulative and irrelevant.[256]  The panel sustained the objection.  So the transcript and audiotape of the statement to the detective was the only statement admitted among those that were subject to Williams' motion to suppress.  At the time of the penalty hearing, Williams had already admitted in open court that he had killed Katherine Carlson.[257]  Williams does show how the transcript and audio tape of his statement added significant weight to the aggravating evidence.  Thus, it is

[255] ECF No. 173-6 at 40-42.

[256] ECF No. 173-7 at 5-7.

[257] ECF No. 173-5 at 14.

not likely that their admission at the penalty hearing had a substantial and injurious effect on the three-judge panel's decision to sentence him to death.  Ground Nine is denied.

**IV.  CONCLUSION**

For the reasons set forth above, Williams is not entitled to habeas relief.

**V.  CERTIFICATE OF APPEALABILITY**

Because this is a final order adverse to Williams, Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  Accordingly, I have *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The COA standard is not high.  Williams must only "'sho[w] that reasonable jurists could debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations omitted).  Having reviewed my determinations and rulings in adjudicating Williams' petition, I conclude that the *Slack* standard is met with respect to my resolution of Claims 1(F) and 1(H).  I therefore grant a certificate of appealability as to those claims.  I decline to issue a certificate of appealability for my resolution of any procedural issues or any of Williams' other habeas claims.

I THEREFORE ORDER that Williams' third amended petition for writ of habeas corpus **(ECF No. 135) is DENIED**.  The Clerk shall enter judgment accordingly and close this case.

I FURTHER ORDER that a certificate of appealability is GRANTED as to my resolution of the following issue:

> Whether Williams has demonstrated prejudice, under *Strickland*, due to counsel's failure to investigate and present available mitigating evidence.

A certificate of appealability is otherwise DENIED.

I FURTHER ORDER that the respondents' motion for leave to file excess pages **(ECF No. 335) is GRANTED** *nunc pro tunc* as of December 5, 2022.

Dated: May 25, 2023

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE